1  Dennis P. Riordan (CABN 69320)
   Donald M. Horgan (CABN 121547)
2  RIORDAN & HORGAN
   523 Octavia Street
3  San Francisco, California 94102
   Telephone: (415) 431-3472
4  Emails: dennis@riordan-horgan.com;
            don@riordan-horgan.com
5
   Attorneys for Defendant
6  LEN TURNER

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11 UNITED STATES OF AMERICA,        )  Case No. CR-17-0175-CRB
                                    )
12            Plaintiff,            )
                                    )
13        v.                        )
                                    )
14 LEN TURNER,                      )  Date: November 20, 2018
                                    )  Time: 10:00 a.m.
15            Defendant.            )  Court: Honorable Charles R. Breyer
                                    )
16 _____ )

17

18

19          DEFENDANT LEN TURNER'S MOTION FOR
          JUDGMENT OF ACQUITTAL (FED.R.CRIM.P. 29)
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

MOTION ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    DEFENDANT TURNER IS ENTITLED TO ACQUITTAL AS A MATTER
OF LAW BECAUSE THE GOVERNMENT'S EVIDENCE WAS CLEARLY
INSUFFICIENT TO PROVE THAT THE ALLEGED COCONSPIRATORS
INTENDED AND AGREED TO DEFRAUD THE DEPARTMENT OF
ENERGY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.    Procedural Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B.    The Relevant Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1.    The Rule 29 Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2.    The *Tanner* Rule Requiring Proof of the
Agency Allegedly Defrauded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C.    The FBI's Bid-Rigging Scheme and The Evidence Concerning
Its Alleged Victim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1.    The LBNL and its Bidding Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2.    Taj Reid and William Joseph/Myles' Discussions of the
Lab Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

a.    The September 9, 2013 Phone Call Between Reid and
Joseph (Exh. 93). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

b.    The September 10, 2013 Phone Call Between Reid and
Joseph (Exh. 95) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3.    Verbal Descriptions of the Project By, or To, Len Turner. . . . . . . . . . . . 12

a.    September 11, 2013 Phone Call Between
Len Turner and  Joseph (Exh. 98). . . . . . . . . . . . . . . . . . 12

b.    September 16, 2018 Dinner Meeting among
Joseph, Reid, and Len and Lance Turner
(Exh. 102). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

c.    October 3, 2003 Meeting among Joseph and Len
and Lance Turner (Exh. 112-1). . . . . . . . . . . . . . . . . . . . . . . . 13

d.    The October 8, 2013 Phone Call Between Reid
and Joseph . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Table of Contents continued**

e.      The October 8, 2013 Phone Call Between Joseph
        and Len Turner (Exh. 119).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

4.      Correspondence and Written Submissions from the
        Turner Group. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        a.      September 16, 2013 email from Len Turner to
                Eve Jones and others of the Turner Group (Exh. 7).. . . . . . . . . . . 14

        b.      September 16, 2013 email from Eve Jones to
                Len Turner (Exh. 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        c.      September 17, 2013 email from Eve Jones to
                Reid at 8:44 a.m. (Exh.12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        d.       September 17, 2013 email from Eve Jones to
                 Taj Reid at 10:29 a.m. (Exh.14). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        e.      September 18, 2013 email from Eve Jones to
                Maria Robles, copied to Len Turner and another,
                at 8:27 a.m. (Exh.16 and Exh. 45) . . . . . . . . . . . . . . . . . . . . . . . . 15

D.      The Evidence Does Not Fairly Support a Reasonable Inference
        that Defendant Intended or Agreed to Defraud the United States
        Department of Energy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.     IN ADDITION TO BEING REQUIRED BY LAW, AN ACQUITTAL
        OF LEN TURNER WILL BE AN EQUITABLE AND JUST RESULT. . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## CASES

*Harrison v. United States,*
7 F.2d 259 (2d Cir.1925). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Beck Industries, Inc.,*
605 F.2d 624 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jackson v. Virginia,*
443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17, 18, 24

*Juan H. v. Allen,*
408 F.3d 1262 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Kearney v. Taylor,*
56 U.S. 494 (1853). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tanner v. United States,*
483 U.S. 107 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Escobar de Bright,*
742 F.2d 1196 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*U\nited States v. Ali,*
266 F.3d 1242 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Allen,*
88 F.3d 765 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Bonds,*
784 F.3d 582 (9th 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Chong,*
408 F.3d 1262 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Heffernan,*
43 F.3d 1144 (7th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. James,*
987 F.2d 1993 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Licciardi,*
30 F.3d 1127 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 9

*United States v. Mendez,*
528 F.3d 811 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Milwitt,*
475 F.3d 1150 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Table of Authorities continued**

*United States v. Nevils,*
598 F.3d 1158 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## STATUTES

18 U.S.C. § 371.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Crim.P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 29(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21

Dennis P. Riordan (CABN 69320)
Donald M. Horgan (CABN 121547)
RIORDAN & HORGAN
523 Octavia Street
San Francisco, California 94102
Telephone: (415) 431-3472
Emails: dennis@riordan-horgan.com;
      don@riordan-horgan.com

Attorneys for Defendant
LEN TURNER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-17-0175-CRB |
| Plaintiff, | ) |
| | ) **DEFENDANT LEN TURNER'S** |
| | ) **MOTION FOR JUDGMENT OF** |
| v. | ) **ACQUITTAL (FED.R.CRIM.P. 29[a])** |
| | ) |
| LEN TURNER., | ) |
| | ) Date: November 20, 2018 |
| Defendant. | ) Time: 10:00 a.m. |
| | ) Court: Honorable Charles R. Breyer |

TO:    **UNITED STATES ATTORNEY ALEX G. TSE AND ASSISTANT UNITED STATES ATTORNEYS KIM HOPKINS AND ANDREW DAWSON; AND TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

PLEASE TAKE NOTICE that on November 20, 2018, at 10 a.m., or as soon thereafter as the matter may be heard before the Honorable Charles R. Breyer, presiding, defendant Len Turner will move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a).

Len Turner moves for such a judgment on the grounds that the evidence was insufficient as a matter of law to convict him of the single conspiracy with which he was charged. The resolution of this motion must be based on the government's case-in-chief.  The government failed to offer any evidence that Len Turner intended to defraud the specific federal agency—the Department of Energy—alleged to have been the object of the charged conspiracy to defraud. Supreme Court case law requires that the defendant "target" a specific federal agency.  There

1  was no evidence in this case to support that element of the offense.

2  **INTRODUCTION**

3  The single count under 18 U.S.C. § 371 with which Len Turner was charged in this case

4  alleged a conspiracy existing between "September 9th and December 31st, 2013...to defraud...the

5  United States Department of Energy." Indictment (ECF 1), par. 43. Len Turner and his co-

6  defendants Lance Turner and Taj Reid were alleged to have "knowingly and intentionally

7  engaged in an illegal scheme to obtain the contract with the DOE to renovate LBNL [Lawrence

8  Berkeley National Laboratory], Building 84, and thereby obtain United States government funds

9  to pay for the renovation, by means designed to impair, obstruct, and defeat the lawful function

10  of the DOE in awarding construction contracts through a fair, honest, and competitive process."

11  *Id*., par. 44.

12  The "Scheme to Defraud" detailed at paragraphs 44 to 46 of the indictment was a sting

13  operation "hatched" by the FBI in the summer of 2013. ECF 127 at 4. Specifically, the

14  indictment alleged a bid-rigging scheme. It alleged that Len Turner agreed with Lance Turner

15  and Taj Reid to submit to the DOE a "fraudulent and non-competitive bid from Turner Group

16  Construction [TGC] to perform the renovation of LBNL Building 84." *Id*. at par. 45. Knowing

17  it was "not a genuine bid," the defendants submitted the TGC bid to the DOE "in an amount

18  higher than Individual A's bid for the sole purpose of artificially ensuring that Individual A's bid

19  on the LBNL Building 84 renovation was the lowest bid."[1] The defendants allegedly "intended

20  to undermine DOE's fair and competitive bidding process and to assist the DOE contracting

21  officer who was colluding with Individual A in awarding the LBNL renovation contract to

22  Individual A." *Id.* at par. 46. For the purposes of this Rule 29 motion to acquit, the only

23  possible members of the conspiracy were Len Turner and Taj Reid.[2]

24  ─────────────────

25  [1] "Individual A" was William Myles, aka "William Joseph," an FBI undercover
26  operative. Myles will be referred to either by his own name or "Joseph" in this pleading.

27  [2] William Joseph/Myles cannot, as a matter of law, be considered a co-conspirator in the
   charged scheme. *United States  v. Escobar de Bright,* 742 F.2d 1196 (9th Cir. 1984).  In

28

1    Supreme Court and Ninth Circuit precedent firmly establish that the proof requirements

2    relating to a charge under "the conspiracy to defraud" clause are both demanding and unique.

3    That case law requires proof beyond a reasonable doubt of the alleged conspirators' intent to

4    defraud the *specific agency* charged as the target of the fraudulent scheme. *Tanner v. United*

5    *States*, 483 U.S. 107 (1987); *United States v. Licciardi*, 30 F.3d 1127 (9th Cir. 1994).  It requires

6    that the defendant target a federal agency.

7    To establish Len's participation in its scheme concocted by the FBI, the government thus

8    had to prove beyond a reasonable doubt a series of subjective mental states: (1) an intention on

9    Len's part to defraud the DOE by "means designed to impair, obstruct, and defeat the lawful

10    function of the DOE in awarding construction contracts through a fair, honest, and competitive

11    process;" (2) an identical state of mind on the part of Taj Reid; and (3) an agreement between

12    Len Turner and Reid to "knowingly and intentionally engage[] in [the] illegal" bid-rigging

13    scheme to obtain the Department of Energy contract for Joseph/Myles.

14    Len Turner submits that no reasonable jury could find proven beyond a reasonable doubt

15    that: (1) he knew that the target of the alleged scheme to defraud was the *United States*

16    *Department of Energy*, and intended to defraud that agency; or (2) Reid had the same knowledge

17    and intent; or (3) that there was a "meeting of the minds" between Len and Reid on the object of

18    defrauding the DOE.

19    Indisputably, the words "Department of Energy" were never spoken or written by Len

20    Turner or Taj Reid during the course of the charged scheme. The term "Department of Energy"

21    was never enunciated during the undercover operation by the two government operatives —

22    Myles or the FBI agent posing as Maria Robles—who were the purported masterminds of the

23    alleged bid-rigging scheme. Nor does the title "Department of Energy" appear on any document

24    handled by Len Turner or Reid.

25    On the other hand, the "proposal" or "bid" submitted by the Turner Group was addressed

26

27    acquitting Lance Turner, the jury found that he did not participate in the charged conspiracy.

28    3

to the "University of California, Berkeley," a famed state institution which manages the Lawrence Berkeley National Lab, which is largely funded by the DOE. The Turner Group proposal had a subject line of the "University of CA Lawrence Berkeley National Library" (sic), wording which was repeated in the proposal's language. There are also numerous references to "Berkeley" in the evidentiary record of what transpired in September and October of 2013. Under the terms of the scheme drawn up by the FBI, it was the Regents of the University of California and their employees who would have conducted the bidding and procurement process for the LBNL building 84 renovation project, and would have done so without any Department of Energy review or supervision.

Absent any mention of the Department of Energy in the conversations between the government undercover agents and Len Turner and/or Reid, or in the conversations between Len Turner and Reid themselves, the government's claim that either Len or Reid could have divined the funding relationship between that federal agency and the Berkeley Lab and then entered into an agreement to defraud the DOE, is, to put it charitably, speculative. Neither speculation nor suspicion cannot defeat a claim under *Jackson v. Virginia*. A directed verdict of acquittal is in order.

**ARGUMENT**

**I.    DEFENDANT TURNER IS ENTITLED TO ACQUITTAL AS A MATTER OF LAW BECAUSE THE GOVERNMENT'S EVIDENCE WAS CLEARLY INSUFFICIENT TO PROVE THAT THE ALLEGED COCONSPIRATORS INTENDED AND AGREED TO DEFRAUD THE DEPARTMENT OF ENERGY**

**A.    Procedural Facts**

On August 27, 2018, at the close of the government's case in chief, the Turners moved for a judgment of acquittal under Rule 29. The Court reserved ruling on the motion and will ultimately decide it at the close of post-trial briefing, including defendant's present written motion. Accordingly, as to the present argument, the Court "must decide the motion on the basis of the evidence at the time the ruling was reserved," i.e., on the basis of the evidence presented in the government's case in chief. *See* Fed. R. Crim. P. 29(b).

At the instructional conference held on August 28th after the evidence closed, the

4

defendants proposed a special instruction which read:

> [I]n order to find the defendants guilty of this charge, the government must prove beyond a reasonable doubt that defrauding the Department of Energy was the object of the defendants' allegedly criminal agreement. Specifically, the government must prove that the defendants agreed and intended to make, or cause to be made, material misrepresentations to the Department of Energy in connection with their alleged 2013 bid relating to the Lawrence Berkeley National Laboratory renovation project.

In the course of that conference, counsel for the United States conceded that the government was required to prove beyond a reasonable doubt that, as alleged in the conspiracy count, the object of defendants' purported criminal agreement to defraud was the United States Department of Energy. The government argued, however, that element of the offense was adequately covered by a portion of the instruction on "Conspiracy to Defraud the United States." The Court agreed, and therefore instructed the jury in relevant part that the government had to prove beyond a reasonable doubt that "beginning no later than September 9, 2013, and ending on or about December 31, 2013, there was an agreement between two or more persons to defraud the United States by obstructing the lawful functions of Department of Energy by deceitful or dishonest means," and that the "defendants became members of the conspiracy knowing of at least one object of the conspiracy and intending to help accomplish it..."

### B.    The Relevant Law

#### 1.    The Rule 29 Legal Standard

Rule 29 mandates acquittal where evidence is insufficient to sustain a conviction. Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the every essential element of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also United States v. Nevils*, 598 F.3d 1158, 1164-1167 (9th Cir. 2010) (en banc); *United States v. Milwitt*, 475 F.3d 1150, 1152 (9th Cir. 2007).

Given that the government will rarely, if ever, fail to establish *any* of the elements of a charged offense, directed verdicts of acquittal generally rest on a judicial finding that a specific element of the charged crime was left unproven. *See, e.g.*, *United States v. Bonds*, 784 F.3d 582

1   (9th 2015) (en banc) (acquitting defendant where government failed to prove materiality element

2   of obstruction charge.)

3          On multiple occasions, the Ninth Circuit has voided convictions due to insufficient

4   evidence of an element necessary for federal jurisdiction — i.e., the federally insured status of

5   the banking institutions which were the alleged crime victims. *See*, e.g., *United States v. Ali*, 266

6   F.3d 1242, 1245 (9th Cir. 2001) (ruling evidence insufficient as a matter of law to establish that

7   bank was federally insured at time of alleged bank fraud and observing "Proof of federal

8   insurance is not merely an element of the offenses for which Ali was convicted; it is essential to

9   establish federal jurisdiction."); *United States v. Allen*, 88 F.3d 765 (9th Cir. 1996) (ruling that

10  evidence was insufficient to establish federally insured status of credit union purportedly

11  victimized by defendant's false statements, rejecting claim, *inter alia*, that such status could be

12  inferred from credit union's title, which included the word "federal"); *United States v. James*,

13  987 F.2d 1993 (9th Cir. 1993) (ruling evidence insufficient to establish FDIC status of two

14  banks in bank robbery prosecution despite (1) defense counsel's concession before jury that

15  commission of the robberies was only the issue in the case and (2) the parties' stipulation

16  concerning "FDIC aspect of the case," which stipulation the government failed to enter into

17  evidence).

18         Likewise, the Circuit has carefully policed the adequacy of evidence of the mental state

19  required for an alleged criminal agreement. In *Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005),

20  the court vacated a double murder conviction obtained on an aiding and abetting theory.

21  Acknowledging "the deference owed to the trier of fact and, correspondingly, the sharply limited

22  nature of constitutional sufficiency review," the court noted that "deference does not imply

23  abandonment or abdication of judicial review." *Id.* at 1275. While the court was required to

24  "draw all reasonable inferences in favor of the prosecution, a 'reasonable'' inference is one that

25  is supported by a chain of logic, rather than ... mere speculation dressed up in the guise of

26  evidence." *Id.* at 1277. Finding that "after resolving all conflicting inferences in favor of the

27  prosecution . . . ," the court concluded that "it is only speculation that supports the conclusion"

28

6

that the defendant had the mental state required for murder. *Id.* at 1279; *see also United States v. Chong*, 408 F.3d 1262, 1277 (9th Cir. 2005) (overturning solicitation to commit murder conviction for insufficient evidence of quid pro quo agreement)

### 2. The *Tanner* Rule Requiring Proof of the Agency Allegedly Defrauded

Section 371 contains two clauses, phrased in the alternative—a conspiracy either to commit any offense against the United States, or a conspiracy to defraud the United States. The indictment in this matter charged a violation of § 371 under the second clause. It alleged that defendant Turner "knowingly and intentionally conspire[d] to defraud the United States, and an agency thereof, that is, the United States Department of Energy ..." Supreme Court and Ninth Circuit precedent firmly establish that the proof requirements relating to a charge under "the conspiracy to defraud" clause are both demanding and unique.[3]

In *Tanner v. United States*, 483 U.S. 107 (1987), the defendants conspired to defraud a private corporation (Seminole) in securing and administering a construction loan from Seminole. The Rural Electrification Administration (REA), a federal agency, was the guarantor of the loan and had the right to supervise the construction project, including use of the loan proceeds.

The defendants challenged their convictions for conspiring to "defraud the United States" under § 371. They argued that Seminole was a private entity and that the evidence therefore failed to satisfy the express statutory requirements under the "defraud" clause. The government argued that Seminole, as the recipient of federal financial assistance and the subject of federal supervision, served as an intermediary performing official functions on behalf of the federal Government, and therefore must be treated as "the United States" for purposes of § 371.

Based on the plain language of § 371's "defraud" clause and the absence of legislative history supporting the government's argument, the Court agreed with the defendants. It held

---

[3] Indictments alleging an offense under the "any offense" clause of § 371 do not impose the knowledge and intent requirements that, as discussed below, apply to an offense charged under the "defraud" clause of § 371. *See*, e.g., *United States v. Mendez*, 528 F.3d 811, 815 (11th Cir. 2008).

that the United States and its agencies must be proven to be the *target* of a conspiracy "to defraud the United States." As the Court observed,

> [t]he conspiracies criminalized by § 371 are defined not only by the nature of the injury intended by the conspiracy, and the method used to effectuate the conspiracy, but also — *and most importantly* — by the target of the conspiracy."

*Id*. at 130 (Emphasis added).

Applying this rationale, the Court held that the indictment must allege, and the proof must show, that the ultimate *object* of the conspiracy was to defraud an agency of the United States. The Court ultimately ruled that the § 371 convictions could stand only if, at a minimum, the evidence established criminal *mens rea* in the form of an agreement to cause the intermediary to make material misrepresentations to the REA. *Id*. at 132.

In *United States v. Licciardi*, 30 F.3d 1127 (9th Cir. 1994), the Ninth Circuit elucidated the exacting proof requirements announced by the *Tanner* Court with respect to a charge under § 371's defraud clause. Licciardi was a grape broker who defrauded a wine producer and was charged under the defraud clause of § 371 because of the regulatory involvement of a federal agency, the Bureau of Alcohol, Tobacco, and Firearms ("BATF"), in the wine industry. *Id*. at 1128-29. The Ninth Circuit held the evidence insufficient on the conspiracy to defraud theory because the evidence had only shown the defendant's incidental impairment of BATF functions rather than "the mens rea of accomplishing that object." *Id*. at 1132.[4]

In the course of its discussion, the Court emphasized the importance of proving the basis for true federal jurisdiction in a case charged under § 371's "defraud" clause. After addressing the fundamental requirement of criminal *mens rea*, the Court observed:

> Much of the reason for insisting on *mens rea* is to prevent "ostensibly innocuous conduct" from unwittingly becoming criminal. ... It will be observed that Licciardi was far from innocent morally or in terms of the law of California. But the question is whether he was innocent of any design to commit a *federal* crime. On this point evidence was required.

---

[4] Licciardi's conviction was affirmed on other grounds. *Id.* at 1134-35.

1   30 F.3d at 1131 (emphasis added).

2       The Court later noted:

3           It might have been easy for the government to establish that
            Licciardi was familiar with the federal regulations on the labeling
4           of wine and that it was a necessary part of his plan of deceit that [a
            third party] provide information to the government that would
5           frustrate these regulations. But we cannot speculate as to what the
            government might have proved when it did not make the effort to
6           show that Licciardi had "conspired to cause" [the third party] to
            provide false information to the BATF. Because this kind of proof
7           was not offered, the basis suggested in *Tanner* for upholding the
            conviction of the Seminole defendants is lacking.

8
9   *Id*. at 1132.  Shortly thereafter, the Court expanded on the reason for requiring substantial proof

10  that the defendant targeted a *federal* agency to sustain a conviction under the defraud clause:

11          Long ago Learned Hand referred to the general conspiracy statute
            as the "darling of the modern prosecutor's nursery." *Harrison v.*
12          *United States*, 7 F.2d 259, 263 (2d Cir.1925). It is understandable
            why that should be so, and it is perhaps understandable but
13          regrettable that prosecutors should recurrently push to expand the
            limits of the statute in order to have it encompass more and more
14          activities which may be deeply offensive or immoral or contrary to
            state law but which Congress has not made federal crimes. ...

15  *Id.* at 1133.

16      Finally, in *United States v. Mendez*, 528 F.3d 811, 814-17 (11th Cir. 2008) the Eleventh

17  Circuit likewise reversed the defendant's conviction for conspiracy to defraud the United States

18  in violation of 18 U.S.C. § 371 on insufficiency grounds. In that case, defendant Mendez and the

19  government had entered into a trial stipulation that Mendez obtained a Florida commercial

20  driver's license using a fraudulent Department of Army "Operatory Qualification Record" form.

21  Mendez purchased the form for $1,000 from a man wearing a United States military uniform.

22  Mendez, however, did not know the purpose of the form or that it was a Department of Army

23  form. The district court did not hear any testimony and found Mendez, who had waived his right

24  to a jury trial, guilty. 528 F.3d at 813–14.

25      On appeal, Mendez argued that, while he defrauded the Florida DMV, the record did not

26  support a finding that he intended to defraud the United States Department of Transportation. He

27  further argued there was no evidence that he knew of any connection between the Florida

28
                                        9

commercial driver's license (CDL) and the federal government.

In reversing, the Eleventh Circuit concluded that "Mendez's § 371 conviction is precisely what the *Tanner* Court meant to prevent" and found that, "the facts to which the parties stipulated do not show that Mendez even knew the federal government was involved in the issuance of Florida CDLs, let alone the United States for the ultimate intentioned target of Mendez's conduct." 528 F.3d at 815. The government nonetheless argued that it was reasonable to infer the defendant knew of federal involvement in the issuance of Florida CDLs, pointed to references to federal law in the Florida CDL handbook and on the Florida DMV website. The Court, however, observed that those facts were not included in the trial stipulation and, as such, were not part of the record. The Court further stated that even accepting these facts as circumstantial evidence,

> they would not be strong enough to support Mendez's § 371
> conviction because the stipulation indicates that Mendez had
> difficulty reading English. Accordingly, we conclude that it would
> be mere speculation, rather than a reasonable inference, to
> conclude that Mendez intended to defraud the DOT based on the
> references to the federal government in the CDL handbook and
> Florida DMV website.

*Id*. at 816. And in a concluding portion of its discussion, the Court in *Mendez* discussed the Ninth Circuit's *Liccardia* decision, *supra*, before observing that the government's case in *Mendez* was even weaker than "the speculation that would have been required for the Ninth Circuit to infer that Licciardi, himself a grape broker, did not foresee the effect of his fraudulent activity on the ATF." *Id.* at 816-17.

**C.    The FBI's Bid-Rigging Scheme and The Evidence Concerning Its Alleged Victim**

**1.    The LBNL and its Bidding Process**

Laura Crosby, a contracting officer for the Lawrence Berkeley National Laboratory, testified that she is employed by the University of California, not the federal Department of Energy. *See* Appendix One to this motion [portions of the Reporter's Transcript of 8/21/18] at 6, 54-55. The LBNL is operated by the Regents of the University of California. *Id.* at 8. Ninety per cent of lab operations are paid for by the federal government. *Id.* at 7.

For the LBNL Building 84 renovation project, the University of California, rather than the Department of Energy, would have handled the procurement and management of such a renovation project by a process written up by the University of California. *Id*. at 55. In 2013, U.C. would have been authorized to handle any contract for the LBNL under $15 million on its own (although in 2018 the permissible upper limit was lowered to $10 million.) *Id*. Contracts under these monetary limits are signed by the U.C. Regents without review or approval of the contracting officer at the Department of Energy. *Id.* at 69-70.

There is a satellite location of the LBNL in Richmond. *Id*. at 20. That is a Berkeley facility that is not funded by the Department of Energy. *Id.* The Richmond station is owned and managed by U.C. *Id.* at 7. Lab scientists sometimes do research out there. *Id.* at 22-23.

The contractor to whom University of California at Berkeley awards a construction project is the prime contractor on the job. *Id*. at 56. A contractor applying to U.C. for a project for the first time would have to fill out a screening questionnaire, which would be very important to Crosby as a contracting officer. *Id*. at 63. The applicant must have an active California contracting license to work on a project. *Id.* at 59. Whether the company had such a license and what kind of license would be very important, as would the provision of references from three companies the applicant had worked with in the last two years. *Id.* at 64. Without such references, a company would not be considered for a project over a million dollars. *Id.*

**2.    Taj Reid and William Joseph/Myles' Discussions of the Lab Project**

**a.    The September 9, 2013 Phone Call Between Reid and Joseph (Exh. 93)**

During this call, the two discussed how the construction project would be presented to the Turners. At one point, Reid said to Joseph, "This is in [sic] Berkeley Labs," and Joseph confirmed this, stating, "This is Berkeley labs," and thereafter says again, "This is Berkeley labs, building 84." *Id*. at 6-7 [Bates nos. 003483-84].[5]

---

[5] All further references to exhibits are to those introduced by the government, and all further references to document numbers are to the Bates numbers appearing on them.

**b.    The September 10, 2013 Phone Call Between
Reid and Joseph (Exh. 95)**

Reid told Joseph that Reid had approached "them" about the construction project by first making a phone call to "him" on September 9th. *Id*. at pp. 2-3 [nos. 003501-02]. Reid's references to "him" and "them" are to one or both of the Turner brothers. *Id*. at pp. 10, 17 [nos. 003509, 003516)]. Reid reported having met with "him" on the morning of September 10th to discuss the job and a meeting with Joseph the coming Monday. *Id*. at p. 2 [no. 003501], et seq. In this connection, Reid "basically told him that it was 7,000 – it was a Berkeley – Berkeley Lawrence – one of the Berkeley – what was it – Lawrence Berkeley – Liver– what is it, Berkeley Livermore Labs," to which Joseph responded, "Uh-huh.  Berkeley."  *Id*. at p.4 [No. 003503].

**3.    Verbal Descriptions of the Project By, or To, Len Turner**

**a.    September 11, 2013 Phone Call Between Len
Turner and  Joseph (Exh. 98)**

Joseph described his purported relationship with the "contracting officer" for the project, recalling how he had been put in touch with someone over at "Lawrence Berkeley."  Exh. 98 at p. 6 [no. 003552]. Thereafter, Len Turner affirmed that he could build the project but expressed uncertainty whether he will be responsible for special windows or special sheetrock.  *Id*. at p. 8 [no. 003554]. Joseph responded that "[t]hey didn't have nothing of that in the scope.  And we can get the scope.  And the bottom line is, if it changed, once we get through it, then I'll go back and get federal money.  Because this is what I got.  They didn't give me the scope. ..." *Ibid*.

**b.    September 16, 2018 Dinner Meeting
among Joseph, Reid, and Len and Lance
Turner (Exh. 102)**

During one exchange, after Len discussed why small contracting firms do not bid on contracts they do not expect to get (Exh. 102 at pp. 90-93 [Nos. 003278-003281], Len stated, "[E]verybody knows you can't get no UC Berkeley or Lawrence Berkeley lab or Kaiser work and all.  That's all inside.  So I'm not wasting my time with this."  *Id*. at p. 93:17-19 [No. 003281].

//

1

2

### c.   October 3, 2003 Meeting among Joseph
### and Len and Lance Turner (Exh. 112-1)

During the meeting, the three received a cell phone call from an FBI agent purporting to be Maria Robles. At the start of the call, Joseph asked Robles how she is doing, and Robles responded, "I'll be honest. Not so great.  I'm on furlough from (inaudible).  So until the government (inaudible), I'm sitting here, doing nothing."  In response, Joseph stated, "The DOE got put on furlough.  I'm sorry." Robles responded, "Yeah. Yeah. All of us -- tried to (inaudible) making money, you know."  The conversation then turned to discussion of construction issues on the project itself.  Exh. 112-1 at p. 9 [US-003390], et seq.

Joseph asked Robles, "When you going to get back off furlough?  Because I don't know who to send [his bid] to if you're on furlough right now." *Id*. at p. 14 [no. 003395].  Robles responded that she is not sure, but that she and Joseph can discuss that "later after my email when you find one [sic]. Hopefully all this gets fixed and I'll be back at work."  Joseph then says, "So once you put it out –," to which Robles gives an inaudible response.  Joseph then said, "Normally, on the government jobs that I did, you said that you were going to put [the public bid solicitation] — it goes public November the 15th," to which Robles responded, "Right." *Ibid*.

### d.   The October 8, 2013 Phone Call Between
### Reid and Joseph

In a conversation between Reid and Joseph on October 8th, Reid told Joseph that he had just talked to Len Turner, and "dude ain't right." Appendix Two at 2. Reid went on to say that Len had told him that Len didn't "believe that this deal is real," and that Len "hadn't even really agreed to take the job 'cause the job's not out there." *Id.* at 2, 4.

### e.   The October 8, 2013 Phone Call Between
### Joseph and Len Turner (Exh. 119)

The two discussed what Joseph may have paid Taj Reid to meet the Turners.  Exh. 119 at pp. 1-3 [nos. 003880-81].  Len Turner said, "[Reid] said – he came in, telling me that he got me this job with LBL and he got my bonding increased and that he thinks that he deserves a hundred thousand plus 5 percent at the end of the project.  And I said, "What project did you get me?" He said the LBL. ... " *Id*. at p. 4 [no.003882].  Thereafter, Len told Joseph that Reid had told Len

13

about what he had done for Len, how he had gotten Len "this job" and increased Len's bonding and therefore deserved payment. *Id*. at p. 7 [no. 003885]. Len then said to Joseph, "And I told [Reid], 'what project have you gotten me?' And [Reid] said, 'I got you the LBL project.' " *Ibid*.

### 4.    Correspondence and Written Submissions from the Turner Group

#### a.    September 16, 2013 email from Len Turner to Eve Jones and others of the Turner Group (Exh. 7)

In this email (*id*. at p. 1 [no. 000847]), Len directed Eve Jones of the Turner Group to "please fill ... out" an attached document. The attached document consists of a one-page "Screening Questionnaire for only Construction Suppliers" for the "Lawrence Berkeley National Laboratory." *Id*. at p. 2 [no. 000848].

The uncompleted questionnaire contains nine questions. Question 7 asks, "Do you have any previous experience with any national labs or any federal government agencies?" At the bottom of the page, the questionnaire directs that the form be submitted to "Maria Robles, Contracting Officer," and includes Robles' phone number and email address listed as "maria.robles.@ bso.science.doe.gov." (*Ibid*.)

#### b.    September 16, 2013 email from Eve Jones to Len Turner (Exh. 9)

This email contains no text but attaches what the email pages identifies as "LBL B84 Prop. doc." *Id*. at p. 1 [no. 000850]. The 3-page attachment (*id*. at pp. 2-4 [nos. 000851-53] is a draft proposal from the Turner Group that is addressed to "the University of California at Berkeley;" identifies the project as "University of CA Lawrence Berkeley National Library [sic], Bldg. 84;" and identifies the subject as "Proposal for Complete Renovation of LBNL-B84-CIG."(*Id*., cover page of attachment/ proposal [no. 000851] (Similar identifying information for the project appears in the text of the short letter on the same page. [*Ibid*.].)

#### c.    September 17, 2013 email from Eve Jones to Reid at 8:44 a.m. (Exh.12)

In this email, Ms. Jones asks Reid to whom she will be submitting the Turner "quote." (*Id*. at p. 1 [no. 000860].) The email is followed by earlier emails from Jones to Reid, one of

14

which references the "LBNL-B84-CIG project." (*Ibid*.)  One of the earlier emails from Jones to

Reid refers to an "attached" pre-screening document for the Turner Group [*ibid*.], not included

in Exhibit 12.

**d.    September 17, 2013 email from Eve
Jones to Taj Reid at 10:29 a.m. (Exh.14)**

This email attaches a "revised quote from Turner Construction Group." *Id*. at p. 1 [no.

000865].  Like the previous exhibit, this email is followed by the earlier emails from Jones to

Reid contained in Exhibit 12 [*see* no. 3.c., above]. The attachment is described on the last page

of the email chain as "LBNL B84 Prop.pdf."  Exh. 14 at p. 3 [no. 000867].  The attachment is a

two page proposal from the Turner Group which identifies the project as the "University of CA

Lawrence Berkeley National Library [sic], Bldg. 84, and the subject as "Proposal for Complete

Renovation of LBNL-B84-CIG." *Id*. at attachment, p. 1 [no. 000868].  A signature appears on

the signature line for "Len Turner, Property Manager," on the second page.  *Id*. at p. 2 [no.

000869]. There was testimony during the government's case that the signature was not that of

Len Turner.

**e.    September 18, 2013 email from Eve
Jones to Maria Robles, copied to Len
Turner and another, at 8:27 a.m. (Exh.16
and Exh. 45)**

This email is entitled, "University of CA Lawrence Berkeley National Library [sic],

Bldg. 84 Center for Isotope Geochemistry." Exh. 16 at p. 1 [no. 000873].  The email is

addressed to "maria.robles@ bso.science.doe.gov."  In the text, Jones, the sender, told Robles

that Jones was attaching the Turner Construction Group's completed Screening Questionnaire

and project proposal.  *Ibid*. The attachments are identified on the email as "LBNL B84

Prescreen. pdf." and "LBNL B84 Prop.pdf." *Ibid*.

The first attachment to the email consists of the screening questionnaire that Len Turner

transmitted to Eve Jones on September 16th (*see* 4.a., above), but with answers to the screening

questions now included. Exh. 16, first attachment, pp. 1-2 [nos. 000874-75].  The response to

item 7 — "Do you have any previous experience with any national labs or federal government

15

1  agencies?" — is "No." *Id.* at p. 1 [no. 000874]. The bottom of the questionnaire directs that it

2  be returned to Robles at the email to which Jones transmitted it. *Id*. at p. 2 [no. 000875]. No

3  signature appears at the end of the completed questionnaire. *Ibid*.

4      The second attachment to the September 18th email consists of a proposal addressed to

5  Ms. Robles as the "Contracting Officer of the University of California at Berkeley."  Exh. 16,

6  second attachment, at p. 1 [no. 000876][.  Like the previous draft proposals, this one identifies

7  the project as "University of CA Lawrence Berkeley National Library [sic], Bldg. 84, and the

8  project as "LBNL-B84-CIG." *Ibid*.

9      Finally, government Exhibit 45 consists of a September 18, 2013 e-mail from Maria

10  Robles to Roahn Wynar forwarding the documents contained in Exhibit 16, as described above.

11      **D.      The Evidence Does Not Fairly Support a Reasonable Inference that**
            **Defendant Intended or Agreed to Defraud the United States**
12           **Department of Energy**

13      A party's knowledge can be proved by what they communicate to others, either verbally

14  or in writing, or what others communicate to them, again either verbally or in writing.

15  Concededly, neither Taj Reid nor Len Turner ever expressed verbally or in writing that the

16  fictional Building 84 project would have been funded by the federal Department of Energy, nor

17  was that proposition ever communicated to them in any manner. Len had no experience working

18  with federal agencies of national laboratories. The evidence is consistent only with the

19  conclusion that Reid and Len Turner believed that the bidding process was being conducted by

20  the University of California at Berkeley, a state institution.  Indeed, from a legal and tactical

21  perspective, one of the fundamental flaws in the design of the sting operation was that the

22  bidding process on the fictional Building 84 project, involving proposals no greater than $6.3

23  million, would have been conducted and entirely controlled by the employees of the Regents of

24  the University of California, without supervision or review by the Department of Energy.

25      Neither Reid nor Len Turner ever expressed an intent to deprive the Department of

26  Energy of a fair and competitive bidding process.  A fortiori, there is no evidence in the record

27  that, with that intent in mind, Reid and Len Turner agreed to achieve that illegal objective. On

28

16

1    this record, no reasonable jury could find the knowledge on the part of either defendant of the

2    Department of Energy's role in funding of the LBNL, nor an intent by either defendant to

3    specifically defraud that federal agency, nor their agreement to do so. To the contrary, any such

4    finding could be based only on speculation and/or a mere modicum of evidence. *Jackson*,

5    *supra*, 443 U.S. at 320;  *Lopez*, *supr*a, 484 F.3d at 1201.

6        The insufficiency of the government's evidence on the key "agency" element of the

7    offense is exposed by the government's rebuttal argument on the issue.

8        AUSA Dawson pronounced the term "Department of Energy" nine times during his

9    rebuttal argument for the government. Appendix Three at pp. 3, 6, 10, 14, 16 [twice], 18 (twice),

10   and 20. None of those pronunciations was a reference to evidence introduced at trial of an

11   instance in which the words "Department of Energy" were enunciated by William Joseph/Myles,

12   "Maria Robles," Taj Reid, or Len Turner (or anyone else), during the course of the charged

13   conspiracy, or a reference to any document handled by Reid or Len Turner that contained the

14   title "Department of Energy." There was no such evidence admitted at trial.

15       In rebuttal, the government relied on four points in arguing that the conspirators — now

16   limited to Reid and Len Turner — must have known that the Department of Energy was running

17   the bidding process, and intended to defraud that agency. First, AUSA Dawson argued that at the

18   October 3rd meeting, the Turners were "told by William Joseph, after Maria Robles says she's

19   sitting there doing nothing, the DOE is on furlough. You know Len Turner was listening to this

20   because Len Turner in a phone call a few days later refers to the fact that Maria was on

21   furlough."  Appendix Three at pp. 16-17.

22       The words "Department of Energy' were not spoken by the relevant players at the

23   October 3rd meeting, nor at any time thereafter.  The government must contend that Joseph

24   mentioning the terms "DOE" and "furlough" in passing proves beyond a reasonable doubt that

25   the listener would know that those letters would refer to the federal Department of Energy.  But

26   Len Turner had addressed his proposal regarding the LBNL to the University of California, a

27   famous educational institution. Given that fact, and absent any evidence of contrary knowledge

28

17

1    on Len's part, DOE would logically refer to the Department of Education, not the Department of

2    Energy. The government introduced no evidence that the federal government was on furlough in

3    October of 2013. The government's claim of Len's knowledge and intent regarding the

4    Department of Energy based on one fleeting reference to the "DOE" is based on pure

5    speculation.

6        Furthermore, to the extent that the government relies on the DOE reference on October

7    3rd as the point at which Len realized that the LBNL project was funded by the Department of

8    Energy, that evidence certainly fails to prove that Len thereafter intended to defraud the

9    Department of Energy or entered into a conspiracy to defraud the Department of Energy with

10   Taj Reid. Reid was not present at the October 3rd meeting to hear Myles' reference to the DOE.

11   There is no evidence remotely supporting the proposition that Len thereafter had a conspiratorial

12   conversation with Taj Reid in which they agreed to defraud the Energy Department's bidding

13   process. Indeed, the evidence of Len's next conversation with Reid came in the form of a

14   conversation between Reid and Myles on October 8th, in which Reid told Myles that he had just

15   talked to Len, and "this dude ain't right." Appendix Two at p. 2. Reid went on to say that Len

16   didn't "believe that this deal is real," and that he "hadn't even really agreed to take the job

17   'cause the job's not out there." *Id*. at pp. 2,4.

18       The government never argued that Len and Reid entered into an agreement to defraud the

19   Department of Energy after the October 3rd meeting. Indeed, in closing argument the government

20   never identified any evidence which supported the formation of a conspiratorial agreement

21   between Reid and Len Turner.  Nor, for that matter, did it point to any evidence that could

22   support a finding as to Reid's knowledge and intent regarding the Department of Energy.  The

23   October 3rd conversation could not possibly convince a reasonable jury beyond a reasonable

24   doubt that a Reid-Len Turner conspiracy to defraud the Department of Energy ever existed.

25       In closing, AUSA Dawson then urged the jury to look at "the pre-qualification form:"

26       There is no mystery that this is a federal project. It says...number
         seven. "Do you have any previous experience with any national
27       labs or any federal government agencies?" It's a national project.
         Lawrence Berkeley National Lab. And if there were any

28

1

2

3

> ambiguity, turn to the next page. Again, this is Exhibit 45, pages four and five: "Please complete and submit this form to Maria C. Robles, Contracting Officer, with an email address at science.doe.gov."

Appendix Three at p. 17.

Again, to repeat the obvious, the pre-qualification form (contained in Trial Exh. 16 and 45) does not contain the term "Department of Energy," nor did it identify any specific government agency. Secondly, by differentiating between "any national labs" and "federal government agencies," the form sent the message that those constituted two different classes of entities. Thirdly, use of the term "national" in no way is limited to federal government agencies or entities: witness "National Basketball Association," "National Broadcasting System," and "National Enquirer."

As to the evidentiary significance of the DOE return e-mail address, there is none. Len Turner never emailed the form to Robles, but sent it to Eve Jones to fill out; she did so, and it was she who returned it, first to Taj Reid, and later to Robles. Exh. 16, 45. Furthermore, unlike most federal email addresses — witness those of the federal courts and federal Department of Justice — the Robles address does not contain the federal reference to "us." It does contain the term "science.doe," fully consistent with a reference to a "Department of Education." A reasonable jury could not attribute inculpatory weight to the pre-qualification document.

The government next referred in rebuttal argument to "conversations on September 11th. This is not a state project. This is not a California university project. There is federal money available here." Appendix Three at p. 17. This is an apparent reference to the September 11, 2013 conversation between Len Turner and Myles in which Len expressed concern that because Building 84 is a laboratory, "they've probably got special windows or special sheet rock . . ." Myles replied: "No. They didn't have nothing of that in the scope.  And we can get the scope. And the bottom line is, if it is changed, once we get through it, then I'll go back and get federal money. Because this is what I got." Exh. 98 at p. 8.

To begin, the government erred in asserting that: "This is not a state project. This is not a California university project." As Laura Crosby testified, the bidding process for the Building 84

1    project described by Myles to Len Turner, because its budget was well under $10 million, would

2    have been directed and completed by U.C. without participation or supervision by the

3    Department of Energy. The contract would have been signed by the UC Regents. The work,

4    while paid by the Department of Energy, would have been managed by the University, as is true

5    of all LBNL operations.

6        Once again, the September 11th conversation contains no mention of the Department of

7    Energy, or even the initials DOE. Under the *Tanner-Licciardi-Mendez* standard and the Court's

8    instructions to the jury in this matter, the specific federal agency that is the target of the fraud

9    must be proven, not merely federal government involvement. Myles's use of the term "federal"

10   is insufficient as a matter of law to meet the test. *See, e.g., Mendez*, at 816. ("[I]t would be *mere*

11   *speculation, rather than a reasonable inference*, to conclude that Mendez intended to defraud

12   the DOT based on the references to the federal government in the CDL handbook and Florida

13   DMV website.") (Emphasis added.)

14       Furthermore, Myles's comment appears to suggest that the project that was under

15   discussion did *not then involve federal money*, but could later do so "if it changed." The

16   September 11th conversation is patently insufficient to support a charge of conspiring to defraud

17   the federal government in general, much less the Department of Energy.

18       Finally, the government argued this in rebuttal:

19            You also heard testimony from Len Turner himself yesterday
             that this was not the only Lawrence Berkeley National Lab
20           associated contract that the Turner Group was looking at. You
             heard him explain there was a whole different project in
21           Richmond, I believe the one that Laura Crosby testified about.
             It was a potential $1 billion, $2 billion project -- I can't
22           remember the terms -- that the Turner Group was interested in
             and Len Turner testified that he had been working with somebody
23           else to look into it. It makes no sense that you, as a
             sophisticated businessman, would look into a project and have
24           no idea who you're dealing with, no idea who might pay the
             bills.
25
     Appendix Three at pp. 17-18.
26
         To begin, nothing in Len Turner's testimony can be cited by the government in its
27
     opposition to this motion, which must be decided by this Court on the state of the evidence at
28

                                        20

the close of the government's case. *See* Fed. R. Crim. P. 29(b). Furthermore, as Laura Crosby

testified, the Richmond site related to the LBNL is owned and managed by the University of

California, and has no legal or financial tie to the Department of Energy.  Appendix One at pp.

6, 19-21. No evidence was introduced at trial that the Department of Energy's potential role as a

funder of the development of the Richmond site (*id.* at p. 22) was ever made public, much less

that Len Turner or Taj Reid ever learned of that potential role. That the government attempted to

rely on anything related to the Richmond site as proof of a conspiracy to defraud the Department

of Energy exposes the patent insufficiency of its evidence to support that charge.

## II.    IN ADDITION TO BEING REQUIRED BY LAW, AN ACQUITTAL OF LEN TURNER WILL BE AN EQUITABLE AND JUST RESULT

Len Turner's motion for acquittal rests on law, not considerations of equity. It is true,

however, that dismissal of this prosecution due to the government's failure to prove what some

might consider a "technical" element of the charged offense would indeed result in both a

legally correct and a just result.

Sting operations turn the usual course of a criminal investigation on its head. Normally, a

crime is reported or suspected, and law enforcement seeks evidence to prove both the crime's

commission and the identity of its perpetrator or perpetrators.  In a governmental sting, however,

a law enforcement agency designs the crime to be committed, decides who has been chosen to

commit it, and then seeks to generate evidence of its commission through the interactions of its

undercover operatives and the sting's targets.  Obviously, in these circumstances, the

government completely bears the burden of creating proof beyond a reasonable doubt of a

defendant's commission of the criminal scheme that the government has "hatched."

The indictment charged Len Turner with what is akin to a classic form of bid-rigging in

violation of the Sherman Act.  As the Seventh Circuit has observed, in the "vast majority of

cases in which the term [bid rigging] has appeared," it has been "treated it as a synonym for bid

rotation," i.e., an arrangement whereby "for each job ... competitors agree which of them shall

be the low bidder, and the others submit higher bids to make sure the designated bidder wins."

*See United States v. Heffernan*, 43 F.3d 1144, 1146-47 (7th Cir.1994), and cases cited therein.

1   Here, one competitor — the Turner Group — was alleged to have submitted a non-genuine bid

2   "in an amount higher than [Joseph/Myles's] bid for the sole purpose of artificially ensuring that

3   [Joseph/Myles's] bid on the LBNL Building 84 renovation was the lowest bid," thereby ensuring

4   Joseph/Myles, supposedly another competitor, would be awarded the Berkeley Lab contract.

5          The government's need to persuade Len Turner to participate in its scheme immediately

6   came in conflict with the law of bid-rigging. There was no evidence introduced at trial of Len

7   Turner's predisposition to commit any crime before the FBI targeted him at the May 9th meeting

8   with Myles. That required the FBI to offer Len some strong incentive to join the Building 84

9   fictional bidding process.  The FBI was well aware from that May 9th meeting that Len was

10  committed to two objectives: (1) gaining prime contractor status on a significant project, and (2)

11  obtaining sufficient bonding to be awarded such a project.  Consequently, in their conversations

12  of September 11th and thereafter, Myles told Len Turner that Len, not Myles, would be the

13  prime contractor and do the construction on the Lab project, and that Myles would supply the

14  bonding. Those stated conditions wholly undermined the government's ability to prove its

15  alleged bid-rigging scheme.

16         Laura Crosby's testimony established that a "developer" like Joseph/Myles who lacked

17  the required experience and license required by the University of California could not qualify to

18  be awarded a contract of the size of the purported Building 84 Project.  Appendix One at pp. 56,

19  59, 63-64. But the Turner Group could so qualify.  Myles' offer to Len Turner to make him the

20  prime contractor on the project and to provide the needed bonding effectively converted the

21  Turner Group's proposal into a joint venture.  And joint ventures between or among competitors

22  do not constitute illegal bid-rigging.  Courts have long recognized that joint bidding can be pro-

23  competitive by allowing individual bidders to pool their resources, efforts, knowledge, or

24  appetite for risk, to make acquisitions together that they could not or would not make

25  independently. *Kearney v. Taylor*, 56 U.S. 494, 520 (1853); *accord In re Beck Industries, Inc.*,

26  605 F.2d 624, 635-36 (2d Cir. 1979).

27         The government forcefully argued in closing that the Turner Group proposal was

28

criminal in nature even if Len Turner intended to win the contract for the Turner Group, because

the proposal was based on improperly obtained inside information from "Maria Robles."

Appendix Three at p. 16.[6]  Obtaining confidential information from a public official in exchange

for something of value can constitute a federal crime: *e.g.*, a Hobbs Act violation or honest

services fraud.  But if the object of such a crime is not to steer a contract to one bidder as

opposed to another, it would not constitute bid-rigging under the Sherman Act, nor would it

constitute the bid-rigging fraud alleged in paragraphs 43 to 46 of Count Eight of this indictment.

While the allegations in those paragraphs were clear enough, the evidence generated by

the FBI through its paid CHS was conflicted and messy at best.  It was no doubt for that reason

that the Court expressed its own confusion and significant reservations as to the validity of the

government's "bizarre" theory of the case. *See* Appendix Four, an excerpt of 8/23/18 RT at 117

("[O]kay. I got -- that's the design of the sting. I mean, it's just bizarre. I mean, I've never seen

anything like that."); *see also* Appendix Five, an excerpt of 8/20/18 RT, at 1- 2.[7]

The failure of proof of the Department of Energy element of the charged conspiracy and

the weird construction of the underlying sting operation certainly cannot be laid at the feet of the

prosecutors who tried this case for the government. Neither had any involvement in designing

the sting operation concocted by the FBI in 2013, and neither had any role in supervising the

creating and gathering of evidence by Myles and "Maria Robles" between September 9th and

October 8th of that year. Those who ran the 2013 sting against Len and Lance Turner are

---

[6] *See id.*: "Listen to the October 3rd conversation. Again, suspicious setting. Len and Lance Turner are listening in, quietly handing notes while William talks to the insider. You heard from Laura Crosby about how inappropriate this would be. This is inside information that is not shared and it's being shared to one bidder who has been promised the contract."

[7] *See id.*: "What is it? Somebody says, 'Oh, we want to build an extension on Livermore. We want to convert this.' You say, 'Fine. I'll do it for 8 million.' What does that mean? I mean, it's a grain of salt, unless a person has the plans and specifications and bids on the plans and specifications. That's my understanding of construction, which I've only done for 25 years.

"But you're saying that even without the plans and specifications, somebody sends in and says, 'I can do the job for 12 million,' that that -- that's phony? I don't know whether it's phony. Is it phony? And are you saying, well, that's not the crime. The crime was they agreed to put in a particular amount....I guess I'd have to look at some cases on that. I just don't get it."

1    responsible for its fundamental deficiencies in both legal theory and evidentiary support.

2         A directed verdict of acquittal of Len Turner in this case is required under *Jackson v.*

3    *Virginia* because even assuming *arguendo* that there was sufficient evidence of a conspiracy,

4    there was no evidence that the conspiracy targeted the Department of Energy.  The dismissal of

5    this deeply flawed prosecution is also in the interest of justice.

6                                  **CONCLUSION**

7         For the foregoing reasons, the Court should enter a judgment of acquittal in favor of

8    defendant Len Turner and dismiss this case with prejudice.

9    Dated: October 1, 2018                    Respectfully Submitted,

10                                             RIORDAN & HORGAN

11

12                                             By  /s/ Dennis P. Riordan
                                                  Dennis P. Riordan

13                                             Attorneys for Defendant
                                               Len Turner

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28