ALEX G. TSE (CABN 152348)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

KIMBERLY HOPKINS (MABN 668608)
ANDREW F. DAWSON (CABN 264421)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Kimberly.Hopkins@usdoj.gov
    Andrew.Dawson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.: CR 17-0175 CRB |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29 |
| v. | |
| LEN TURNER, | Hearing: November 20, 2018 |
| Defendant. | Time: 10:00 A.M. |
| | Court: Hon. Charles R. Breyer |

TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ...................................................................................................................1

II. PROCEDURAL BACKGROUND........................................................................................1

III. ARGUMENT...........................................................................................................................1

    A. Applicable Law..............................................................................................................1

        1. Federal Rule of Criminal Procedure 29 ...................................................................1

        2. The "Defraud" Clause of 18 U.S.C. §371................................................................2

    B. The evidence was sufficient to permit a rational juror to find beyond a reasonable doubt that the defendant conspired to defraud the United States. .....................3

        1. There was an agreement between Taj Reid and Len Turner to defraud the United States by obstructing the lawful functions of a government agency by deceitful or dishonest means...................................................................4

        2. Len Turner knew that the goal of the conspiracy was to defraud the United States. ..........................................................................................................7

        3. Taj Reid and Len Turner performed numerous overt acts for the purpose of carrying out the conspiracy..................................................................9

    C. The Defendant Mischaracterizes the Government's Burden of Proof.............................10

IV. CONCLUSION......................................................................................................................12

## TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Dennis v. United States*, 384 U.S. 855 (1966) .................................................................................. 3

*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ............................................................... 2, 3

*Hass v. Henkel*, 216 U.S. 462 (1910).................................................................................................. 2

*Jackson v. Virginia*, 443 U.S. 307 (1979)........................................................................................... 2

*Tanner v. United States*, 483 U.S. 107 (1987) ..................................................................... 3, 10, 11, 12

*United States v. Caldwell*, 989 F.2d 1056 (9th Cir. 1993)................................................................. 3

*United States v. Conti*, 804 F.3d 977 (9th Cir. 2015) ........................................................................ 3

*United States v. Gillock*, 886 F.2d 220 (9th Cir. 1989) ..................................................................... 2

*United States v. Gjerde,* 11 F.3d 595 (8th Cir. 1997) ...................................................................... 12

*United States v. Licciardi*, 30 F.3d 1127 (9th Cir. 1994)............................................................. 11, 12

*United States v. Mendez*, 528 F.3d 811 (11 Cir. 2008).............................................................. 11, 12

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) .................................................................... 2

*United States v. Ramos*, 558 F.2d 545 (9th Cir. 1977) ..................................................................... 2

*United States v. Tuohey*, 867 F.2d 534 (9th Cir. 1989) .................................................................... 3

Federal Statutes

18 U.S.C. §371.................................................................................................................................. 1, 2

Federal Rules

Federal Rule of Criminal Procedure 29 ............................................................................................. 1

## I. INTRODUCTION

The defendant has filed a motion for judgment of acquittal on a single ground, arguing that there was insufficient evidence to prove that Len Turner intended to defraud the Department of Energy. In the course of his motion, Turner dutifully recounts the copious evidence that the defendants knowingly targeted the Department of Energy—from references to federal money, to national labs, to federal government agencies, to the DOE itself—and yet argues that the jury was obligated to ignore these references. Instead, the defendant argues that the jury should have credited other evidence and concluded that the defendant, a sophisticated businessman, remained oblivious to the repeated references to the federal nature of his target. But Rule 29 does not permit the Court to weigh the evidence in this manner. It is undisputed that the documentary and recorded evidence at trial contained repeated references to the Department of Energy. The Court must therefore deny defendant's motion.

In an effort to bolster his efforts, defendant also misstates the government's obligations under Section 371's defraud clause. Contrary to defendant's claims, neither the Supreme Court nor the Ninth Circuit requires that the government prove the specific federal agency targeted by the conspirators. On the contrary, the statute itself criminalizes conspiring to "defraud the United States, **or** any agency thereof . . ." (emphasis added). While the government is obligated to prove that the target was a federal entity, as opposed to a private or state entity, the law does not require the defendant to announce the specific federal department he intends to defraud.

## II. PROCEDURAL BACKGROUND

On April 6, 2018, a federal grand jury charged defendants Len Turner, Lance Turner, and Taj Reid in count eight of an Indictment, with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. On June 18, 2018, Taj Reid pleaded guilty to the charge. Trial as to Len Turner and Lance Turner began on August 20, 2018. The jury was unable to reach a unanimous verdict as to Len Turner, and acquitted Lance Turner. This motion followed.

## III. ARGUMENT

### A. Applicable Law

#### 1. Federal Rule of Criminal Procedure 29

In evaluating a defendant's motion for acquittal pursuant to Federal Rule of Criminal Procedure

UNITED STATES' OPPOSITION
CR 17-0175 CRB                                       1

29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  In making this determination, a court "must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." *United States v. Gillock*, 886 F.2d 220, 222 (9th Cir. 1989) (quoting *United States v. Ramos*, 558 F.2d 545, 546 (9th Cir. 1977)).  The question "is not whether the evidence excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive at its conclusion." *United States v. Nevils*, 598 F.3d 1158, 1165 (9th Cir. 2010).  If any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt, then the motion must be denied.  *Id.* at 1164.

### 2. The "Defraud" Clause of 18 U.S.C. §371

The general conspiracy statute, 18 U.S.C. §371, creates an offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."  The operative language here is the so-called "defraud clause," which prohibits conspiracies to defraud the United States.  This clause creates a separate offense from the "offense clause" in Section 371.  Both offenses require the traditional elements of Section 371 conspiracy, including an illegal agreement, criminal intent, and proof of an overt act.

The origins of the understanding of the defraud clause were provided by the Supreme Court in two early cases, *Hass v. Henkel,* 216 U.S. 462 (1910), and *Hammerschmidt v. United States*, 265 U.S. 182 (1924).  In *Hass* the Court stated:

> The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government.  (A)ny conspiracy which is calculated to obstruct or impair its efficiency and destroy the value of its operation and reports as fair, impartial and reasonably accurate, would be to defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially required in the way and at the time required by law or departmental regulation.

*Hass*, 216 U.S. at 479-480.

In *Hammerschmidt*, Chief Justice Taft defined "defraud" as follows:

> To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention.

*Hammerschmidt*, 265 U.S. at 188.

The general purpose of this part of the statute is to protect governmental functions from frustration and distortion through deceptive practices. Section 371 reaches "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government. *Tanner v. United States*, 483 U.S. 107, 128 (1987); *see Dennis v. United States*, 384 U.S. 855 (1966). The "defraud" part of section 371 criminalizes any willful impairment of a legitimate function of government, whether or not the improper acts or objective are criminal under another statute." *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989).

The Ninth Circuit's model jury instruction lays out the elements of a defraud clause violation, which also are clearly stated in *Conti*, *Caldwell*, and *Tuohey*[1]:

1. An agreement between two or more persons to defraud the United States by obstructing the lawful functions of a government agency by deceitful or dishonest means;

2. That the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it;

3. An over act in furtherance of the conspiracy.

9th Cir. Model Jury Instr. 8.21.

**B.   The evidence was sufficient to permit a rational juror to find beyond a reasonable doubt that the defendant conspired to defraud the United States.**

The defendant argues that no reasonable juror could conclude that the defendant intended or agreed to defraud the United States. However, as begrudgingly detailed in defendant's own motion, ample evidence demonstrates that Len Turner intended to defraud the Department of Energy ("DOE").

---

[1] *United States v. Conti*, 804 F.3d 977 (9th Cir. 2015); *United States v. Caldwell*, 989 F.2d 1056 (9th Cir. 1993).

UNITED STATES' OPPOSITION
CR 17-0175 CRB                                                    3

The evidence contains references to federal money, to national labs, to federal agencies, and repeated references to the DOE. Defendant's motion seeks to explain away these references, and in effect argues that the jury was obligated to assume that Len Turner was either too oblivious or too unsophisticated to appreciate the obvious import of these references.  The jury had no such obligation, and in fact the voluminous recorded statements introduced at trial demonstrate that Len Turner was neither oblivious nor unsophisticated.  Because a reasonable juror could conclude based on the evidence that the defendant intended to target the federal government and the DOE, the Court should deny the motion.

> **1.    There was an agreement between Taj Reid and Len Turner to defraud the United States by obstructing the lawful functions of a government agency by deceitful or dishonest means.**

The first element of the defraud clause requires the government prove an agreement between two or more persons to defraud the United States by obstructing the lawful functions of a government agency by deceitful or dishonest means. 9th Cir. Model Jury Instr. 8.21.  In the present case, Taj Reid, acting as a private party and not a government agent, pitched the idea of rigging the bids on the Building 84 contract to the Turner Group.  Reid spoke to the defendant on September 10, 2013, and got him on board for the bid-rigging scheme.  It was not until September 11 that the CHS spoke with the defendant, for the first time in over four months, when Taj Reid invited the CHS into a call he was already having with Turner.  This was the first time the CHS discussed the Building 84 contract with the defendant, and the conversation occurred only after Reid had already introduced the idea.

Indeed, all roads to the Turners led through Taj Reid.  By September 2013, the FBI and CHS knew that Reid was predisposed to contract fraud (having conceived of the CalVet bribe with Worthen), and that Reid and Worthen had discussed, between themselves, trying to get the Turner Group involved in a Lawrence Berkeley Lab contract in Richmond.  Reporter's Transcript ("Tr.") at 20-28, Testimony of Special Agent Quinn ("Quinn").  Accordingly, during a meeting with Reid on September 5, 2013, the CHS told Reid that he might be able to get the Turners some work, but did not explain.  Tr. at 32-33, Testimony of CHS ("CHS").

The CHS mentioned the Lawrence Berkeley National Lab ("LBNL") Building 84 deal to Reid during a phone call on September 9, 2013. The CHS said the Building 84 project had not hit the street, the CHS knew the contracting officer, and the deal was his. Ex. 93-1; Ex. 093-004 – 093-005. The

CHS suggested that Reid talk to the Turner Group about the project to see if they wanted it. *Id*. The CHS said that if they could not do the work, then he did not want them. *Id*. Also, Reid needed to be sure that the Turners could keep their mouths "shut." *Id*.

The next day, September 10, 2013, Reid told the CHS that he met with "them" and "they accepted it." Ex. 95-1; Ex. 095-002. The CHS asked if Len Turner asked any questions about how the CHS got the plans for the project. Ex. 95-1; Ex. 095-006. Reid responded that he told Turner there was a need for discretion and Turner said, "that's fine, I don't want to know anything." *Id*. Reid told the CHS that he was talking to Turner about compensation for himself. *Id*. at Ex. 95-1; Ex. 095-007.

Later that day and again on September 11, 2013, the CHS and Reid had telephone conversations during which the CHS explicitly laid out the specifics of the corrupt relationship with the DOE contracting officer and the need for phony "competing" bids. *See* Ex. 96-1; Ex. 096-001 – 096-006; Ex. 97-1; Ex. 097-004 – 097-008. The CHS told Reid he had the deal "on the inside" and "they giving me the number, I already know the number." *Id*. The CHS said that in order for the contracting officer to look good, the officer "has to have at least two more bids on the side." *Id*. The CHS explained: "I'm making sure that everybody's number is higher than mine." *Id*. Reid then said: "Right, right, right. And then you come in under." *Id*. The CHS told Reid what he needed from the Turner Group; he needed the Turners to submit "a phony bid" of $6,150,000. *Id*. The CHS said he had someone else coming in a bit higher than that. *Id*. The CHS explained that the Turners would send in their bid; the CHS would get the job; and then "me and him work out a deal." *Id*. Reid responded with "Okay" and "allright." *Id*.

Later on September 11, 2013, the CHS spoke on the phone yet again to Reid and Reid put Len Turner on the line to speak to the CHS. Ex. 98-1; Ex. 098-002 – Ex. 098-013. This was only the second conversation that the CHS had with Turner. Turner took the lead. Ex. 98-1; Ex. 098-004. After asking the CHS how he was, *Turner* thanked the CHS for the opportunity and then said he was prepared to put "that" on his letterhead. *Id*. He asked the CHS if the CHS needed a "bid-bid" and the CHS responded, "no," in that case, "you got to do a real take-off." *Id*. Turner said, "Exactly. That's what I was telling Taj." *Id*.

The CHS then went on to explain that he had a past relationship with the contracting officer who was now at Lawrence Berkeley; the officer said, "Look, I can get you this deal"; the officer gave him the

DOE's $4.1 million estimate of the cost of the project; and "I need two or three other people to bid against me." Ex. 98-1; Ex. 098-006 – 098-008.  The CHS added, "So this is the deal I have. I have to get a couple of phony bids, get them, higher than my number. *Id.*  That's why I told him to tell you to bid six one one-fifty. *Id.*  My bid now, even though the cost is 5.1 [sic], I can come in between 5.7 and 5.9 and get it." *Id.*

The CHS and Turner then discussed the cost to build, and Turner said "Yeah. Yeah. I can build it." Ex. 98-1; Ex. 098-008. This exchange followed:

LEN TURNER: So that's why – that's why I was asking. If you just want me to put the number down that you – that you provided, then I can do that. But if I've got to do a real take-off and get a –

CHS: Ah, no, no. You got the spend money to do that.

TURNER: That's going to take me – that's going to take me forever.

CHS: No. No. I've got to have it by next week, so –

TURNER: Okay. All right. So I'll just have – I'll just have my office prepare the bid, because it's just one or two pages. But normally I have some exclusions and inclusions, but –

CHS: (Inaudible) and everything else.

TURNER: Yeah, but –

CHS: We don't have to go through all that. We're going to take advantage of it because we have – we didn't know all of those things that happened. So it was automatic that they was going to give me a change order. So I can change all that back into your profitability. But it's already super profit.

TURNER: Okay.

Ex. 98-1; Ex. 098-009 – 098-010.

The CHS explained that he needed the Turner Group to do an excellent job because he was looking to get "the job behind the job."  Ex. 98-1; Ex. 098-010 - 098-011.  Turner said "we going to do the best job ever." Ex. 98-1; Ex. 098-011.  He and the CHS then discussed the CHS's winning bid number, the Turner Group's bid number, and the fact that the CHS had one more bid coming in at $6.3 million. Ex. 98-1; Ex. 098-011 – 098-012.  Turner responded: "Okay. I got it. I hear you. I hear you clearly now. Okay? I got it." *Id.*

In short, by the time Reid put the defendant on the phone with the CHS on September 11, 2013, the defendant was already on board with the conspiracy and had already agreed with Reid to submit a false bid to the DOE. The topic of discussion between the CHS and the defendant was ensuring that the Turner Group would not have to do any actual work in submitting a bid, and instead would only have to send in the low-ball number that Reid had already given the defendant. Thereafter, the CHS would "win" the bid and throw the work to the Turner Group. Thus, the conspiracy was formed when Reid and the defendant agreed to submit the fraudulent bid.

### 2. Len Turner knew that the goal of the conspiracy was to defraud the United States.

As to the second element of the defraud clause, the government must prove that the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it. 9th Cir. Model Jury Instr. 8.21. One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. *Id.*

The evidence at trial proved that the defendant joined the conspiracy knowing that its object was to defraud the United States, and he intended to help accomplish it. As stated above, by the time Reid put the defendant on the phone with the CHS on September 11, 2013, Turner was already on board with the conspiracy and had already agreed with Reid to submit a false bid. The defendant learned additional details of the conspiracy during the September 11 phone call. The CHS explained his past relationship with the contracting officer who was now at Lawrence Berkeley. He also explained he had been promised a contract by the officer, but needed several higher bids in order to justify awarding the contracts to the CHS.

The evidence also demonstrates that Len Turner knew that the ultimate goal of the conspiracy was to defraud the United States. On September 16, 2018, the defendant concedes that he was informed by the CHS that there was "federal money" available in the event of cost overruns. Docket No. 294 at 19. Thus, only days after the defendant agreed to submit a phony bid, he was informed in unambiguous terms that the money funding the deal was "federal." Even before that date, the defendant received a prequalification form from Taj Reid that demonstrated both the federal nature of the project and DOE's

involvement. Ex. 007. The prequalification form—which Len Turner received by email on September 16, 2013—asked whether the Turner Group has "previous experience with any national labs or any federal government agencies?" *Id.* Obviously, a reasonable juror could conclude that a questionnaire probing previous experience with the federal government would have alerted Len Turner that the project was federal. And more specifically, the form sent to Len Turner by Taj Reid reflected that the point of contact for bids was Maria Robles, who was assigned a "doe.gov" email address. The defense seeks to minimize this evidence by arguing, in effect, that Len Turner was too unsophisticated to understand what "DOE" refers to in the context of a federal laboratory project. His motion argues that while the form identifies the "DOE," it "does not contain the term 'Department of Energy,'" and that Len Turner might have thought that a "national lab" was analogous to the "National Enquirer." Docket No. 294, at 19. This is absurd. The jury was not obligated to impute such an extraordinary degree of naiveté to Len Turner; on the contrary, Turner's recorded statements demonstrate his sophistication.

   Subsequent recorded statements dispel any doubt that Turner knew the target of the conspiracy. In a recorded conversation on October 3, 2013, Len Turner, Lance Turner, the CHS, and an undercover agent playing the role of "Maria Robles" had a telephone conversation. By this point, Len Turner had discussed the availability of "federal money" with the CHS and had received numerous emails reflecting both DOE's involvement and the federal nature of the project (i.e. "national lab" and "federal agency" references). During the call, the undercover agent stated that she was on furlough, and the CHS stated in response: "The DOE got put on furlough. I'm sorry." Ex. 112-1; Ex. 112-008. And while the pending motion relies in large part on the notion that Len Turner was simply not paying attention to the conversations he participated in or the documents he received by email, the record demonstrates that he was paying attention to this conversation. A few days later, in a phone call with the CHS, Len Turner noted that "Maria" had been on furlough and that the government was shutdown. Ex. 119-2; Ex. 119-007. And as the Court is well aware, the federal government shutdown in the fall of 2013 was front-page news across the country.[2] Once again, defendant's argument relies on the false assumption that the

---

[2] *See, e.g.*, Jonathan Weisman & Jeremy Peters, "Government Shuts Down in Budget Impasse," N.Y. Times, Sept. 30, 2013, *available at* https://www.nytimes.com/2013/10/01/us/politics/congress-shutdown-debate.html.

UNITED STATES' OPPOSITION
CR 17-0175 CRB          8

jury was obligated to agree that the defendant was too oblivious to connect the obvious dots between the federal shutdown and the DOE.

### 3. Taj Reid and Len Turner performed numerous overt acts for the purpose of carrying out the conspiracy.

The third element of the defraud clause requires the government to prove that one of the members of the conspiracy (Taj Reid or Len Turner), performed at least one overt act for the purpose of carrying out the conspiracy. An overt act does not itself have to be unlawful. 9th Cir. Model Jury Instr. 8.21. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. *Id.* The government is not required to prove that the defendant personally did one of the overt acts. *Id*. In the present case, the defendant performed numerous overt acts, but the government will highlight three overt acts below.

The evidence at trial proved the defendant performed an overt act on September 16, 2013, when the defendant, his brother Lance, and Taj Reid, met the CHS at a restaurant in San Francisco to discuss the bid rigging scheme. Within a minute of arriving and greeting the CHS, the defendant handed the CHS a letter addressed to UC Berkeley with a bid to perform the work on the LBNL Building 84 for $6,100,500.00. Ex. 40; Ex. 102-2; Ex. 102-042; Tr. at 61 (CHS). Shortly thereafter, the defendant called his office and directed that the bid be signed and submitted to the DOE contracting officer. Tr. Ex. 102-6; Ex. 102-064 – 102-065; Tr. at 73 (CHS).

The defendant performed an overt act two days later on September 18, 2013. At the defendant's direction, an employee of the Turner Group emailed the Turner Group's completed Screening Questionnaire and revised bid letter to the DOE contracting officer, Maria Robles, at maria.robles@bso.science.doe.gov. Ex. 016-001 – 016-005.

Lastly, the defendant performed an overt act on October 3, 2013, when he met the CHS in his hotel room for a telephone conversation with the DOE contracting officer. Ex. 112-1, Ex. 112-008. The undercover agent playing the role of the DOE contracting officer provided the CHS and the defendant an update on the status of the contract, and they further discussed the details of the conspiracy. Ex. 112-1; Ex. 112-009 - 112-013.

UNITED STATES' OPPOSITION
CR 17-0175 CRB                                                9

### C.   The Defendant Mischaracterizes the Government's Burden of Proof

The defendant argues that the government must also prove that the defendant specifically intended to defraud the Department of Energy as opposed to some other agency or the United States government itself. The defendant mischaracterizes the government's burden of proof, and seeks to require the government to prove an "agency element" with no support from the statute or case law.

In support of his argument, the defendant relies heavily upon *Tanner v. United States*. In *Tanner,* Seminole Electric Cooperative, Inc., a private corporation, obtained a bank loan for a power plant construction project which included an access road. The loan was guaranteed by the federal Rural Electrification Administration (REA), which had the right to supervise the project and to approve certain contracts. The Supreme Court held that a private corporation receiving federal assistance and was the subject of Federal Government supervision could not itself be treated as the United States for purposes of the statute prohibiting conspiracies to defraud the United States. The facts in Tanner are inapposite to the facts of this case. The LBNL is a research and science facility located on the University of California Berkeley campus. Tr. at 3 (Testimony of Laura Crosby ("Crosby"). Unlike the private corporation receiving federal assistance in *Tanner*, the LBNL buildings are owned and funded by the Department of Energy. *Id*. at 8, 23. While the laboratory buildings sit on land owned by University of California Regents, the buildings themselves are considered federal property. *Id.* at 21. The Department of Energy also funds new facilities built on the property and renovations of existing buildings. *Id*. at 24. Moreover, the defendant's interpretation of *Tanner* goes far beyond the holding of that case. *Tanner* does not require that the government prove the defendant specifically intended to defraud the Department of Energy. Rather, *Tanner* simply holds that to support a conviction of conspiracy under Section 371, the government has to prove that the United States **or** one of its agencies was the target of the alleged conspiracy. *Id.* at 130.

The defendant's reliance on *United States v. Licciardi* and *United States v. Mendez* is misguided as well. In *Licciardi*, the defendant was a grape broker who defrauded a wine producer and was charged under the defraud clause because of the regulatory involvement of a federal agency, the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). *Licciardi*, 30 F.3d 1127, 1128-1129 (9th Cir. 1994). The court held that the government failed to show anything beyond the defendant's incidental impairment of

ATF. *Id.* at 1132. In *Mendez*, the court held the government failed to prove that the defendant, by fraudulently obtaining a Florida commercial driver's license, had the intent to defraud the United States, as required for conviction for conspiracy to defraud the United States. *Mendez*, 528 F.3d 811, 815-816 (11th Cir. 2008). The court reasoned that although the United States Department of Transportation ("DOT") promulgated the minimum rules and regulations for obtaining a driver's license, it would have been mere speculation to conclude that the defendant intended to defraud the DOT based on reference to the federal government in the driver's handbook and the Florida Department of Motor Vehicles website. *Id.* Like *Tanner*, both *Licciardi* and *Mendez* are inapposite because they involved federal entities with a tangential relation to the intended victim of the fraud.

The central role of the federal government to the charged scheme distinguishes this case from *Tanner*, *Licciardi*, and *Mendez*. The scheme in this case involved sending a phony bid to a DOE employee in the hope of earning a federal construction contract at an inflated price, which placed the federal government squarely in the crosshairs of the conspiracy. Unlike in defendant's cases, the federal government here was hardly a bit player. The facts of this case are far closer to the facts considered by the Eighth Circuit in *United States v. Gjerde*, 11 F.3d 595 (8th Cir. 1997). In *Gjerde*, the defendants conspired to cheat the Department of Housing and Urban Development ("HUD") out of approximately $275,000. However, the defendants in that case interacted only with state and local officials who were authorized to act on behalf of HUD, and the misstatements in question were made to those officials. The Eighth Circuit found that *Tanner* was no bar to the convictions because "a reasonable jury could have concluded that the target of the conspiracy was HUD, as represented by MDTED, the state agency that administered the HUD Small City Grant Program." *Id.* at 601. The HUD money in *Gjerde* was granted to the state and was subject to substantial federal regulation, and thus "the funds did not lose their federal character." *Id.* On the contrary, the state agency "was simply a state agency charged with administering the federal program." *Id.*

The Eighth Circuit in *Gjerde* ultimately held that the state agency "was acting as an agent of HUD, and any conspiracy to defraud MDTED with regard to the HUD Small Cities Grant Program funds was in effect a conspiracy against HUD itself." 110 F.3d at 601. So it is here. The defendant's

scheme in this case was to defraud the Lawrence Berkeley Labs, which "was in effect a conspiracy" against DOE itself.

### IV. CONCLUSION

For the reasons outlined above, the government respectfully requests that the Court deny the defendant's motion for judgment of acquittal.

DATED: November 1, 2018           Respectfully submitted,

ALEX G. TSE
United States Attorney

_____/s/_____
KIMBERLY HOPKINS
ANDREW F. DAWSON
Assistant United States Attorneys