Pages 1 - 64

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER

```
UNITED STATES OF AMERICA,        )
                                 )
               Plaintiff,        )
                                 )
     vs.                         )   No. CR 17-0175 CRB
                                 )
LEN TURNER and LANCE TURNER,     )
                                 )   San Francisco, California
               Defendants.       )   Monday
                                 )   August 20, 2018
_____)   10:15 a.m.
```

**EXCERPT OF JURY TRIAL PROCEEDINGS**
**OPENING STATEMENTS**

**APPEARANCES:**

```
For Plaintiff:          ALEX TSE
                        Acting United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                BY:     KIMBERLY HOPKINS
                        ANDREW DAWSON
                        ASSISTANT UNITED STATES ATTORNEYS


For Defendant           RIORDAN & HORGAN
Len Turner:             523 Octavia Street
                        San Francisco, California 94102
                BY:     DENNIS RIORDAN, ESQ.


For Defendant           BOERSCH SHAPIRO, LLP
Lance Turner:           1611 Telegraph Avenue
                        Suite 806
                        Oakland, California 94612
                BY:     MARTHA BOERSCH, ESQ.
```

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
              Official Reporter - US District Court
              Computerized Transcription By Eclipse

```
1   Monday - August 20, 2018                        12:08 p.m.

2                    P R O C E E D I N G S

3                        ---oOo---

4        (Prior proceedings held herein, reported

5         but not transcribed.)

6             *        *        *        *        *

7        (Proceedings held in open court, outside

8         the presence and hearing of the jury.)

9            THE CLERK:  Calling Criminal Action CR 17-0175, USA

10  versus Len Turner and Lance Turner.

11       Counsel, please state your appearances for the record.

12           MS. HOPKINS:  Good afternoon, your Honor.

13  Kimberly Hopkins and Andrew Dawson for the United States.

14           MR. RIORDAN:  Good afternoon, your Honor.  Dennis

15  Riordan for defendant Len Turner, who is present here in court.

16  And I'm joined by paralegal Marlin Schulz who is inside the

17  bar.

18           MS. BOERSCH:  Martha Boersch for Lance Turner who is

19  also present and Roxanne Vorkoeper from my office will be

20  assisting the Defense.

21           THE COURT:  So we are still waiting for one juror.

22  And my Courtroom Deputy -- there has been no message, so we're

23  trying to contact that one juror to see what the situation

24  is. It happens to be an alternate, juror number 14.

25
```

PROCEEDINGS

1          (Discussion held off the record between the Court and

2           the Courtroom Deputy.)

3          (Brief pause.)

4          **THE COURT:**  The name of the co-defendant, this is for

5    instruction number 2.16, exactly how do I refer to him?  It

6    says:

7          "For reasons that do not concern you, the case

8          against co-defendant blank is no longer before you" --

9          well, it never was before them -- "do not speculate

10         why."

11         This is really given if a defendant leaves a trial in the

12    middle of the trial.  I don't think it's appropriate to give it

13    now.

14         **MR. DAWSON:**  I think the Government's interest is

15    simply that they are going to be hearing about Taj Reid, but

16    he's not sitting in the courtroom and to dispel any curiosity

17    about what their role should be or if your Honor prefers to

18    give nothing.

19         **THE COURT:**  I prefer to give nothing.  In the

20    closing, final instructions I certainly can give something, if

21    you think it's warranted and I would.  I would.

22         **MS. HOPKINS:**  Your Honor, just a housekeeping matter.

23    If we could invoke the rule excluding witnesses?

24         **THE COURT:**  Okay.  Any objection to that?

25         **MS. BOERSCH:**  No, your Honor.

1      MR. RIORDAN:  No, your Honor.

2      THE COURT:  Okay.  So they can sit here for the

3  opening, but then after that.  Other than if you have your

4  investigators testify -- I don't know whether you will or

5  not -- they can stay.

6      MR. DAWSON:  We will, your Honor.

7      (Brief pause.)

8      (Jury enters the courtroom at 12:21 p.m.)

9      THE COURT:  Call the case again, if you will.

10      THE CLERK:  Calling Criminal Action CR 17-0175, USA

11  versus Len Turner and Lance Turner.

12      Counsel, please state your appearances.

13      MS. HOPKINS:  Good afternoon, your Honor.  Kimberly

14  Hopkins and Andrew Dawson for the United States.

15      Also seated at counsel table is Special Agent Ethan Quinn

16  and Special Agent Jason Miller.

17      MR. RIORDAN:  Good morning -- good afternoon, your

18  Honor.  Dennis Riordan for defendant Len Turner, who is present

19  here in court today.

20      And I'm joined by paralegal Marlin Schulz, who is sitting

21  within the bar.

22      MS. BOERSCH:  Good afternoon, Your Honor.  Martha

23  Boersch for the defendant Lance Turner, who is present at the

24  table.

25      And with me is my assistant Roxanne Vorkoeper.

1      **THE COURT:**  Thank you.

2      Would you administer the oath to the jury.

3      (Jurors placed under oath.)

4      **THE CLERK:**  Thank you.  Please be seated.

5      **THE COURT:**  Well, good afternoon, ladies and

6   gentlemen.  Thank you all for coming back.  I appreciate it.  I

7   hope you were able to organize -- other than some emergency,

8   organize your -- this week and next.

9      As you know, we're not meeting on Wednesday and we're not

10  meeting on Friday.  So we're meeting Tuesday and Thursday and

11  then resuming next week.

12     Last time you were here I gave you a number of

13  instructions called preliminary instructions, but I would like

14  to give you just a few more if I may.  Because I think they'll

15  be useful.  At the end of the trial I will give you, each of

16  you, a copy of the written instructions, which is the law that

17  you must apply to this case.

18                  **PRELIMINARY JURY INSTRUCTIONS**

19     **THE COURT:**  If you wish, you may take notes to help

20  you remember the evidence.  If you do take notes, please keep

21  them to yourself until you and your fellow jurors go to the

22  jury room to decide the case.  Do not let note taking distract

23  you from being attentive.  When you leave the Court for

24  recesses, your notes should be left either in the jury room

25  or -- I would suggest you take them to the jury room.  No one

 1    will read your notes.  Whether or not you take notes, you

 2    should rely on your own memory of the evidence.  Notes are only

 3    to assist your memory.  You should not be overly influenced by

 4    your notes or those of your fellow jurors.

 5         Now, as I said before, you are now the jury in this case

 6    and I want to tell you something about your duties as jurors

 7    and to give you again some preliminary instructions.  At the

 8    end of the trial I will give you more detailed written

 9    instructions that will control your deliberations.

10         When you deliberate, it will be your duty to weigh and to

11    evaluate the evidence received in the case and in that process

12    to decide the facts.  To the facts as you find them you will

13    apply the law as I give it to you, whether you agree with the

14    law or not.

15         You must decide the case solely on the evidence and the

16    law before you and must not be influenced by any personal likes

17    or dislikes, opinions, prejudices, sympathy or biases,

18    including unconscious bias.  Unconscious biases are

19    stereotypes, attitudes, or preferences that people may

20    consciously reject, but may be expressed without conscious

21    awareness, control or intention.  Like conscious bias,

22    unconscious bias, too, can affect how we evaluate information

23    and make decisions.

24         In addition, please do not take anything I may say or do

25    during the trial as indicating what I think of the evidence or

PRELIMINARY JURY INSTRUCTIONS

1   what your verdict should be.  That is entirely up to you.

2        Now, you observed that there are two defendants in this

3   case and although the defendants are being tried together, you

4   must give separate consideration to each defendant.  In doing

5   so, you must determine which evidence in the case applies to

6   each defendant, disregarding any evidence admitted solely

7   against some other defendant.  The fact that you may find one

8   of the defendants guilty or not guilty should not control your

9   verdict as to any of the other defendants.

10       The next phase of this trial will now begin.  First, each

11  side may make an opening statement.  An opening statement is

12  not evidence.  It is simply an outline to help you understand

13  what the party expects the evidence will show.  A party is not

14  required to make an opening statement.

15       The Government will then present evidence and counsel for

16  the defendant may cross examine.  Then if the Defendant or a

17  Defendant chooses to offer evidence, counsel for the Government

18  may cross examine.

19       After the evidence has been presented, I will instruct you

20  on the law that applies to this case and the attorneys will

21  make closing arguments.  After that, you will go to the jury

22  room to deliberate on your verdict.

23       So as I indicated, we will start first with the

24  Government's opening statement.

25

## OPENING STATEMENT

1

2          **MR. DAWSON:**  Ladies and gentlemen, the evidence that

3    you will be hearing over the course of this trial boils down to

4    a simple story.  It's a story about cheating.  The defendants,

5    Len Turner and Lance Turner, conspired with Taj Reid to cheat,

6    to defraud the Department of Energy out of taxpayer money.

7          Now, the specific kind of cheating you'll be hearing about

8    is known as bid rigging.  Now, one form of bid rigging occurs

9    when you have an insider to some sort of a contract who

10   promises the benefits of that contract to one party.  But in

11   order to make it look like a competitive process, you may have

12   two other people pretend to bid on that contract and to send in

13   bids higher than the first, all the while knowing that the

14   first party had already been promised that contract.

15         For example, you will be hearing about the Department of

16   Energy and their processes for when they have a construction

17   project.  You'll hear that if they wanted to renovate a

18   building, they send out some details about the project to

19   solicit what are known as bids from contractors who can

20   estimate how much they think it will cost to do the job.  Just

21   like you might do with a large purchase of your own, they shop

22   around for the best value.

23         You'll hear evidence in this trial that the point of this

24   process is to ensure that the Government gets the best value

25   for its money.  You'll also hear evidence that when this

OPENING STATEMENT / DAWSON

1   process is interrupted, when you have, for example, collusion

2   among the bidders, the buyer ends up paying more than what's

3   fair.  And, ladies and gentlemen, that's what this case is

4   about.  It's about rigging the bidding process and corrupting

5   the competition.

6       The evidence will show that Taj Reid, Len Turner, and

7   Lance Turner -- and you have a chart that I believe has popped

8   up on your screens.  Len Turner and Lance Turner are the

9   defendants in court today.  The evidence will show that these

10  three men conspired to rig the bidding process for a

11  construction contract at the Lawrence Berkeley labs over in

12  Berkeley, California, just across the bridge.  The evidence

13  will show that the three co-conspirators believed that there

14  was a corrupt insider within the Department of Energy who had

15  promised a contract, who had promised a construction contract

16  to a fourth individual by the name of William Joseph.

17      Now, the design of the bid-rigging scheme that you will be

18  hearing evidence about was that the insider had promised the

19  contract to William Joseph.  The defendants knew that the

20  estimated actual cost of the project was about $4.1 million.

21  You'll hear evidence that William Joseph expected to get the

22  contract for $5.9 million, almost $2 million more than what the

23  estimate would have suggested.  Now, what William needed in

24  order to get this contract was to get somebody else to submit

25  bids even higher than his so that the insider could justify

1    giving the contract to William Joseph.

2         William Joseph wanted to cover his tracks and make it

3    appear like a normal competitive process.  So that's what the

4    Turner's construction group, the Turner Group did.  On

5    September 18th, 2013, the Turner Group submitted by email a bid

6    for the Lawrence Berkeley construction project in the amount of

7    $6.15 million, exactly the amount they had been told to bid by

8    Taj Reid.

9         And the evidence in this case will also demonstrate why

10   the Turners agreed to do this.  As I mentioned ago, there will

11   be evidence that they knew that the estimated cost was

12   $4.1 million, but that William Joseph was prepared to get the

13   contract for $5.9 million, a potential profit of almost

14   $2 million.

15        Now, you'll hear that William Joseph's cover story when he

16   was here -- excuse me -- I'll get to him in a minute.  You'll

17   hear that William Joseph was from out of town and what he

18   needed was to have somebody local who could actually do the

19   work for him once he got the contract.  So the Turners expected

20   they would get this profitable contract in the amount of about

21   $5.9 million, but the cost would, in fact, be $4.1 million.

22   That's the profit.

23        Now, as I alluded to a moment ago, what Lance Turner,

24   Len Turner, and Taj Reid didn't know was that William Joseph

25   was in reality a man by the name of William Myles, who was

1  working with the FBI as a confidential source.  William was

2  working with the FBI agents on a corruption investigation.  In

3  reality there was no construction contract.  There was no

4  insider who had promised William a deal.

5      You may remember from jury selection a few weeks ago when

6  Judge Breyer instructed you that in the course of its

7  investigations, law enforcement sometimes uses stealth and

8  deception, and that's what this was.  You'll hear evidence that

9  this was a sting operation.

10     You'll hear evidence as well about what led up to the use

11 of that technique.  But the defendants, Len Turner and

12 Lance Turner, didn't know that nor did they know that

13 William Joseph was recording his conversations both over the

14 phone and in person with the defendants and with Taj Reid.

15     Now, over the course of the next few days, you'll be

16 hearing a number of these conversations.  And when the trial is

17 over, the evidence that we expect to present to you will prove

18 beyond a reasonable doubt that the defendants conspired to

19 defraud and to cheat the Department of Energy out of money.

20     Now, ladies and gentlemen, my trial partner introduced our

21 team a few moments ago, and I wanted to take a minute to go

22 into a little more detail.  My name is Andrew Dawson.  I'm an

23 Assistant United States Attorney here in San Francisco, as is

24 my trial partner, Kim Hopkins.

25     At our table we also have FBI Special Agent Ethan Quinn,

1   who is also operating our computer.  He's one of the agents who

2   worked on the investigation, and we expect you'll be hearing

3   from him.  And at the end of the table we also have Special

4   Agent Jason Miller, who is a Special Agent with the Department

5   of Energy in the Office of the Inspector General.

6        Now, as the Judge mentioned to you a few moments ago, the

7   things that I say when I'm standing here and the things that

8   defense counsel say when they are standing here, this isn't

9   evidence.  Instead this is our opportunity to give you a bit of

10  a road map, a framework so that when the evidence comes in,

11  either from the testimony -- the testimony of the witnesses who

12  are under oath or the exhibits that are admitted into evidence,

13  I hope that this statement will give you a framework so that

14  you can see how things fit together when the evidence starts

15  coming in.

16       Now, when I began, I gave you the 10,000-foot summary of

17  what this case was about.  I want to take a few minutes to get

18  into a little more detail.

19       The key dates in this investigation are in September of

20  2013.  On September 9th, 2013, William Joseph, who, as I

21  mentioned, was an FBI undercover source, at the direction of

22  the FBI reached out to Taj Reid, who is one of the individuals

23  on the screen in front of you, and told him that he,

24  William Joseph, had been promised a construction deal by an

25  insider at the Lawrence Berkeley Labs.  William told Taj Reid

1    that the deal was his because he knew the contracting officer.

2    He had an insider.  And he asked Taj to reach out to the

3    Turners to Len Turner and Lance Turner, to see if they wanted

4    the job and whether they could be discreet, whether they could

5    keep their mouth shut.

6        You're going to hear evidence that Taj Reid by this point

7    had already participated in two very similar

8    construction-related conspiracies.  The evidence will show that

9    the next day on September 10th, 2013, the Turners joined the

10   conspiracy.  On that date Taj Reid and William spoke on the

11   phone.  It's a recording that we expect you'll hear at trial.

12       During the conversation between Taj Reid and

13   William Joseph, after a few minutes Len Turner joins the call.

14   He joins the call and you'll hear his voice, and you'll hear

15   that he understood the scheme.  He understood the plan.  He

16   knew about the insider.  And he was in.

17       Len Turner also told Taj Reid that he didn't have any

18   problem keeping his mouth, being discreet, and that he didn't

19   want to know anything about how William got the contract.

20       That same day in other phone calls that you'll hear

21   between William and Taj Reid, William fills in some more of the

22   details about exactly how the scheme is supposed to work.

23   William explained that what he needed was a phony bid -- that's

24   a term you'll hear on the recordings -- and that the bid should

25   be about $6.15 million.  William told Taj that he needed this

1    bid to come in at that price to help cover his tracks to ensure

2    that he could get the deal for himself.

3         Now, I want to take a moment to play a portion -- I might

4    have confused my dates.  September 11th is the conversation

5    between William Joseph and Taj Reid where Len Turner joins the

6    conversation.  You will hear more of this recording during the

7    trial, but I wanted to give you the opportunity to hear what

8    it's like to hear some of these recordings.  So this is a small

9    portion that I'm going to play.  And you'll see the transcript

10   show up on the screens in front of you, if all goes well, and

11   you'll hear the recording itself.

12        So, Ethan, if we could do 98-1.

13        (Audiotape played in open court, not reported.)

14        **MR. DAWSON:**  So as you hear on that recording and as

15   you will hear in the recorded evidence, Len Turner knew what

16   the scheme was, and he was in.

17        Now I'd like to play one more excerpt from that recording,

18   which is 98-2.

19        (Audiotape played in open court, not reported.)

20        **MR. DAWSON:**  So as you can hear, as I mentioned a

21   moment ago, the evidence will show that Len Turner anticipated

22   he would get the work for this deal that William Joseph had

23   arranged to get for an inflated price.

24        Another recording from a few days later demonstrates that

25   the defendants were willing conspirators along with this idea.

1   On September 16th, 2013, Len Turner, Lance Turner, and Taj Reid

2   had dinner with William Joseph.  Within minutes of joining the

3   dinner, Len Turner handed William Joseph a bid letter on the

4   construction contract in question as he'd been requested.

5        During the conversation that was recorded and which we

6   expect you'll hear at trial, Len Turner explained that he

7   didn't do his own estimate of what the job would cost and that

8   he didn't plan to do one until after William got the job.  And

9   again I want to play for you a short excerpt of what this

10  conversation was like.

11       Ethan, if you could pull up --

12       **THE COURT:**  We have two alternates that are having

13  some difficulty seeing the screen.  Why don't you sit -- just

14  move over, and for this purpose just sit on the bench.  I think

15  that would be of assistance.  And then when we're finished, you

16  can move back.  Okay.

17       (Brief pause.)

18       (Audiotape played in open court, not reported.)

19       **MR. DAWSON:**  As you heard, the evidence will show

20  that Len Turner at the dinner says his people didn't even look

21  at it, but he took the number he had been provided and he put

22  it on the letter.

23       You'll also hear a recording of another meeting a few

24  weeks after this on October 3rd, 2013.  This is a meeting with

25  William Joseph and with the two defendants in this case,

1    Len Turner and Lance Turner.   The meeting on October 3rd took

2    place at a hotel room, at William Joseph's hotel, and the

3    background for the meeting was that William invited Len Turner

4    and Lance Turner to come listen in on a conversation that

5    William planned to have with his insider.   William said he was

6    going to be talking to his contact inside the Department of

7    Energy, and he invited Len Turner and Lance Turner to listen

8    in.   You will hear on the recording of the October 3rd meeting

9    that the insider, who's referred to as Maria, called William

10   and told him that the deal was his.   Quote, "you know it's

11   yours," while the Turners were listening in on speakerphone.

12        Maria went on to say that the Turners' phony bid looked

13   okay but the third bid that had ostensibly been solicited

14   wasn't going to work.   So Maria informed William they needed

15   another bid, a third bid to come in higher than Williams to

16   make the scheme work.   Maria on the call confirmed that the

17   true estimated cost of the project was 4.1 but that William was

18   going to get it for 5.9 if they could get the third bid.

19        Now, you'll hear the Turners and William on the recording

20   strategizing about how they might go about to get this third

21   bid to make the scheme work.   Len Turner on the recording

22   suggests having his cousin Fred submit a bid as well.   Fred has

23   a separate contractor's license, according to the recordings,

24   although he's also affiliated with the Turner Group.

25        Now, on the recording you will hear Lance Turner respond

1   by worrying that because the cousin is also associated with the

2   Turner Group, it might be traced back to the Turner Group.

3   Again, I'm going to play for you a sample of that meeting.

4        There are going to be two clips, and we'll start with

5   112-1.

6        (Audiotape played in open court, not reported.)

7        **MR. DAWSON:**  If we can now pull up 112-2, which is

8   another clip from the same meeting on October 3rd.

9        (Audiotape played in open court, not reported.)

10       **MR. DAWSON:**  So as the recording reflects,

11  October 3rd, a few weeks after the conspiracy kicked off,

12  Len Turner and Lance Turner are actively strategizing trying to

13  find a way to make the scheme work and to get that third bid

14  they need in order to get the contract down the road.

15       Now, in order for you to get a complete picture of the

16  players in this story, the evidence that will come in at trial

17  we anticipate will go back a few months before September of

18  2013.  You'll hear evidence going back to April and May of

19  2013, about five months earlier.  You'll hear that during that

20  time period, Taj Reid, who is one of the co-conspirators, had a

21  partner and they had a consultant -- consulting company and

22  they were trying to drum up some business and to find some

23  work.  You'll hear recordings of Taj Reid talking with William

24  in this time period about his business, about his hopes to make

25  some money.

1      One of the subjects you'll hear them discussing is the

2  fact that Taj Reid and his partner proposed a different insider

3  construction scheme to William.  Taj Reid's partner,

4  Eric Worthen, was himself an insider, and you'll hear

5  recordings where Taj Reid discusses his interest in setting up

6  a conspiracy to provide William Joseph with insider information

7  about those separate contractors.  Those recordings will

8  demonstrate that Taj Reid knew how this worked.  He knew about

9  bidding processes, and he knew what he was doing was wrong.

10  You'll also hear in this same time period that Taj Reid was

11  actively talking about other ways that he could make money.  He

12  was looking for other clients.

13      You'll hear that one of the clients he was talking about

14  was the Turner Group.  You'll hear that he had discussions with

15  individuals who worked for the Turner Group.  He had a meeting

16  with Len and Lance Turner in this springtime period in 2013.

17  And at some point you'll hear that Taj Reid and Eric Worthen

18  had an idea, that maybe one thing they could do of value that

19  might get them paid would be to introduce William Joseph to the

20  Turner Group.

21      Now, William Joseph's presence, his role, was as a

22  developer who was from out of town.  So Taj Reid had the idea

23  that if he introduced a developer from out of town to a local

24  contracting company, maybe he could get made.  Maybe that would

25  be of value and Taj Reid's consulting company could start

1   making money.

2       They ultimately set up a meeting between William and

3   Len Turner on May 9th, 2013, at the Turner Group offices in

4   Oakland, California.  Almost the whole meeting was recorded,

5   and I expect at trial you'll hear the whole meeting.  It's less

6   than an hour.  Closer to a half hour.

7       On the recording you'll hear the men discuss their

8   businesses, their backgrounds.  They discussed some of the

9   challenges facing the Turner Group.  And then it was over.

10  Once that meeting ended on May 9th, 2013, the next time

11  William Joseph spoke to Len Turner was the recorded phone call

12  we heard a few minutes ago on September 11th, 2013, when

13  Len Turner told William that he would send in the phony bid.

14  Five months after the May meeting.

15      The recordings will also demonstrate for you the nature of

16  the relationship between Taj Reid and the Turners during the

17  conspiracy.  One constant theme is Taj Reid worried that he's

18  not getting paid enough for his efforts.  The first time you'll

19  hear this coming up is in connection with the May 9th, 2013

20  meeting.  He also thinks that he deserves more of a payday for

21  his role in providing the Turners the information about the

22  construction deal at the Lawrence Berkeley Labs.

23      You'll hear on the recordings Len and Lance Turner

24  resisting the idea of paying Taj Reid, but you'll also hear

25  evidence that Taj Reid did get paid by the Turners at least for

1    the May 9th meeting.  Why was that?

2        Well, as Len Turner says on a recording, it's because Taj

3    is connected.  Taj Reid's father at the time and today is

4    Larry Reid, who is on the City Council in Oakland.  Taj Reid is

5    not shy about talking about his father, not shy about talking

6    about his influence and about his connections.

7        On October 8th, 2013, about a month after the conspiracy

8    began, Taj Reid explains that he thinks the Turners need to

9    stay in Larry Reid's good graces and that Larry Reid wouldn't

10   take too kindly to his son getting cut out of the deal.  So

11   you'll hear Taj Reid angling to get himself a bigger part of

12   the project and more profit.

13       Apart from the recordings and William's testimony, you'll

14   also hear testimony from two of the law enforcement agents who

15   participated in the investigation.  You'll hear about the

16   development of the operation and about the sting.  You'll also

17   hear about one agent who went to interview Len Turner months

18   after the conspiracy ended.  You'll hear about the contents of

19   that interview, and you'll hear evidence that Len Turner knew

20   it was illegal to have submitted that bid.

21       When Len Turner was asked months after the conspiracy

22   whether the Turner Group had even submitted a bid on the

23   Berkeley Lab deal, he lied and said the Turner Group had never

24   submitted such a bid.  But you'll see evidence and you'll hear

25   recordings about exactly that bid, which was submitted on

1   September 18th, 2013.

2       Ladies and gentlemen, this is an overview of what we

3   expect the evidence will show.  As I said at the beginning, it

4   boils down to a story about cheating and about fraud, about

5   taking shortcuts.

6       I very much appreciate the time, the attention that you've

7   paid to me this afternoon, and I know you'll pay the same

8   courtesy to Mr. Riordan and Ms. Boersch, who will be standing

9   up in front you in a few moments.

10      Now, at the end of the trial once the evidence is in, the

11  witnesses have testified and the exhibits have been admitted,

12  we'll have the chance to come back and present what are called

13  "closing arguments," where we have the chance to take the law

14  as it's given to you and we argue about the facts and what

15  those facts show.  And at that time we'll be asking you to

16  return the only verdict that's consistent with the evidence,

17  which is guilty beyond a reasonable doubt.

18      Thank you very much.

19          **THE COURT:**  Thank you.  Let me have the alternates

20  move back into their seat.

21      (Brief pause.)

22          **THE COURT:**  Okay.  Mr. Riordan, you may proceed.

23                      **OPENING STATEMENT**

24          **MR. RIORDAN:**  Members of the jury, good afternoon.

25      As Judge Breyer said, opening statements can be an outline

OPENING STATEMENT / RIORDAN

1   of the evidence, but as the Government made clear, they

2   organize it to tell the story that they want to tell.  And the

3   story they want to tell will have a simple title:  Len Turner

4   is beyond -- is guilty beyond a reasonable doubt of conspiracy

5   to defraud the Government of the United States by submitting a

6   false bid on a construction project at the Lawrence Berkeley

7   Lab.

8        But the Government's opening addressed only some of the

9   evidence that you're going to hear.  We submit that when you

10  hear the evidence in totality, the story is going to have a

11  different title.  This is the case of the strange tale of

12  Billy Myles and the Government's sting operation that did not

13  make any sense.  It did not make any sense twice over.

14       It did not make any sense to Len Turner.  And the reason

15  for that is that Len Turner understands bidding in California.

16  Whoever designed the sting operation didn't.  And for that

17  reason, as I'll explain in a few minutes, Len Turner submitted

18  a bid that was genuine.  I say a bid.  I should say a proposal

19  because what you're going to hear is there is a big difference

20  between a proposal and a real bid.  It was genuine.  Because he

21  believed that he could get this project as the primary

22  contractor on the lab project.  Okay?  And that he knew that

23  William Myles couldn't.  William Myles could not qualify to get

24  this project.  So when he submits a proposal for $6.1 million,

25  he believes that they can get the project if William Myles does

 1   what he had promised to do, which was bond the project.  And

 2   I'll tell you a little more about that.

 3       So we believe that the evidence is going to show that this

 4   is a genuine bid in Len Turner's mind that is not in any way

 5   false.  And the evidence is also going to show that this sting

 6   operation didn't make any sense in another sense, which is that

 7   the Government had no business, had no business trying to

 8   induce Len Turner to commit a crime.  Because the laws of the

 9   United States forbid the Government to manufacture crimes.

10   They can offer opportunities to commit crimes to real

11   criminals, but they may not induce honest citizens and attempt

12   to induce honest citizens to commit a crime.

13       Now, I'm Dennis Riordan, and as you know, I represent

14   Len Turner.  As with the Government, I thank you for taking the

15   time out to serve on this jury, to preserve a right that every

16   American enjoys in this country, which is to have a jury, not

17   the Government, not a judge, a jury decide whether a crime has

18   been committed.

19       And I'm going to talk about the evidence.  We all agree

20   that what I say is not evidence.  As is true of the Government.

21   What they said, none of it is evidence.

22       I'm also going to touch on the law.  You can't really make

23   sense of what went on in this case without having some

24   understanding of the law, but as Judge Breyer explained, he

25   will give you the law that applies to the case at the end of

1   the evidence.

2        Now, you're going to see a lot of documents offered into

3   evidence during the course of the case.  But one thing you

4   won't see in evidence is the indictment.  It's not evidence.

5   But it's hugely important nonetheless because what it does is

6   it informs the defendant of what he's charged with, and it

7   states the facts that the Government must prove beyond a

8   reasonable doubt in order to convict him.

9        And in order to understand the charge, we've got to look

10  at a document that the Government has referred to, and I'll ask

11  Roxanne if she can pull it up, which is the document that was

12  submitted and then Len did approve the submission of this, to

13  be used for the University of California.

14       Can we have it up on the screen?

15       (Document displayed)

16       **MR. RIORDAN:**  It's up on my screen.  Is it up on

17  yours?  I think so.

18       All right.  Let's look at some important things about

19  this.  It's for the University of California, which, as you

20  know, is perhaps the greatest university in the United States.

21  My daughter graduated from there.  And it's about a project at

22  the Lawrence Berkeley National Lab.  And look at the subject:

23  Proposal for Complete Renovation of LBN and BA4 or CIG, and To

24  Whom It Concerns.  And it has a number on it.  Lump sum bid.

25  Okay?  As we're going to learn, this is not what Len Turner

1  calls a bid bid.  That is a real full bid.  A full bid looks

2  about like -- it's about that thick (indicating).  Okay?  It

3  has all of the details of the work that's going to be done on a

4  project and, very importantly, and I'm going to come back to

5  this a lot, it has the details about bonding and the

6  contractor's ability to provide bonding for a project.

7       Well, this isn't a gun.  It's not a bomb.  It's not a

8  knife.  It's a piece of paper.  And it's got a number on it.

9  And pieces of paper with numbers on it are not crimes.  What

10  the Government alleges in the indictment makes this a crime is

11  the mental state.  What's in Len Turner's mind when he submits

12  this.  And that makes sense.  I mean, lending a car is a

13  perfectly legal act, but if you give it to your friend and say,

14  "Go rob a bank with it," that's your intent.  That's a crime

15  for sure.

16       And so what does the indictment say is the mental state of

17  the defendant that makes this a crime?

18            "The defendant submitted the bid to the

19       University of California, essentially, in an amount

20       dictated by Individual A."  We know that's

21       William Myles acting as William Joseph.  "That was

22       higher than the bid that Individual A" -- that's

23       Joseph -- "represented that he had submitted to the

24       lab project.  The defendant submitted this bid knowing

25       it was not a genuine bid.  The defendant submitted the

OPENING STATEMENT / RIORDAN

1    Turner Group Construction bid and arranged for the

2    submission of the bid to the university for the sole

3    purpose of artificially ensuring that Individual's A

4    bid," Joseph's bid, "was the lowest bid.  In doing so,

5    the defendants intended to undermine the fair and

6    competitive bidding process that would go on for this

7    project."

8       That's the mental state that they have to prove beyond a

9    reasonable doubt.

10      So let's with that in mind turn to May 9th, because

11   May 9th is one of the critical dates, the beginning critical

12   date in this case.  May 9th is the day that Len Turner meets

13   William Myles, William Joseph, at his headquarters, the Turner

14   Group's headquarters in Oakland.  Okay?  And let's talk about

15   who the main players are on May 9th.  The first is Len Turner.

16   Who is Len Turner?

17      Len Turner did then and still does run the business side

18   of the Turner Group, a family construction company founded by

19   Len and his brothers and sisters.  And all -- they are a large

20   family.  Okay?  And all of the siblings trained under the

21   watchful eye of Ben Turner.  Ben Turner, their dad, is an

22   ex-Marine who started out as a repairman on Volkswagens and had

23   all of his children learning how to work and fix Volkswagens.

24   And he was able to build up his own business in Oakland where

25   all of the children continued to work.

 1          And like all of his brothers and sisters, Len Turner

 2    idealized Ben Turner.  And that's an event.  The event of his

 3    death in July of 2013 plays a role in this case.  The Turners

 4    ran a clean business and were held in high regard in East Bay

 5    in 2013.  Before the accusation in this case, Len Turner had

 6    led an absolutely law-abiding life.  He had never been

 7    convicted of a crime.  He had never been accused of a crime.

 8    And what was very true about the Turner Group since their

 9    founding in 2005 is that they were very much concerned about

10    the minority employment in Oakland and promoting it.

11          But the company's success had been hindered by one big

12    factor, which is that bonding capacity.  Bonding capacity.

13    When you get a project, you have to put up an insurance policy

14    in essence, that if anything goes wrong, the insurance company

15    is going to have to pay off.  And each company, depending on

16    their size, has a limit on their policies.  And for the Turner

17    Group, it was $12 million.  That can sound like a lot of money,

18    but if you have three or four projects, 2 million here,

19    3 million there, you get up to 12 million pretty quickly.  And

20    once you do, you've got to stop.  You can't get another

21    project.  You have to wait until you complete one and free up

22    your bonding for that project.  Okay?  So $12 million was a

23    real limit.  It's not the kind of capacity you need to take on

24    a major project or build a hotel in Oakland.  Okay.  So Len is

25    always as the head of the business, business side of the Turner

1   Group, thinking about bonding capacity.  What can he do about

2   bonding capacity at the same time as he's trying to maintain

3   the company's cash flow and keep -- keep the business afloat.

4        All right.  Person Number 2.  Billy Myles.  Now, when I

5   say Billy Myles, I mean no disrespect because Mr. Myles

6   generally introduces himself as Billy.  You'll find out his FBI

7   code name now is Lilac.  Lilac.  I didn't make that up.  I

8   couldn't make that up.  Mr. Myles wasn't admitting to be

9   Billy Myles in May of 2013 because he was playing the role of

10  William Joseph.

11       Now, we're going to hear some testimony, I suspect, from

12  Mr. Myles on his life history prior to February of 2006.  But

13  that date is important because that's the date he first

14  contacted the FBI in an effort to get assistance from the

15  Bureau for his son Marcus.

16       Mr. Myles will testify that in 2005 when he was living in

17  Hartford, Connecticut, his son Marcus was arrested for dealing

18  drugs in Oklahoma City, where Mr. Myles maintained the family

19  residence.  With his son facing decades in prison, Myles

20  decided that he would attempt to trade information about

21  alleged corruption in Hartford with the FBI's assistance in

22  keeping Marcus out of prison.  The evidence will show that the

23  United States Attorney's Office in Connecticut had many

24  communications with the D.A.'s office in Oklahoma, asking that

25  Marcus' case be postponed so the FBI could supply the D.A. with

1   information on Myles' work as at that time as an unpaid

2   informant.

3         And it all worked out.  Marcus got a deferred sentence

4   that saved him from jail or prison with the condition that the

5   entire case would be dropped if he stayed out of trouble for

6   five years.  And in May of 2007, Billy Myles then was hired as

7   a paid confidential human source by the FBI, and he's continued

8   in that position through today.  Lamentedly, in 2013, as soon

9   as his five-year probation was completed, Marcus went back to

10  dealing drugs in Oklahoma City.  He's once again been charged

11  and convicted with drug dealing in Oklahoma City, although the

12  deal he got was pretty favorable.

13        Now, in baseball a utility outfielder is a guy who can be

14  brought in to play a lot of different positions and be called

15  upon to move around from position to position as needed.

16        So you might call Billy Myles the utility infielder of the

17  FBI's national sting program.  Between 2007 and now, Mr. Myles

18  has been brought in as a civilian undercover operative for the

19  FBI in sting operations around the country, a number of them in

20  Louisiana between 2008 and 2012.  He was recently involved in a

21  sting operation in Baltimore.  To promote his role back in

22  2000 -- December of 2007, the FBI paid a newspaper to fly a

23  journalist down to write a story about Mr. Myles and what a

24  leader he was in civil rights and how concerned he was about

25  minority employment.

 1        Of course, all of this is a lie.  He was -- this was to
 2   introduce him, to promote his role as undercover informant.
 3        Now, Agent Quinn, who I believe will be perhaps the
 4   Government's first witness, brought Myles out here in 2012 to
 5   work on Bay Area stings at the recommendation of another --
 6   actually an agent of the FBI who was also an undercover
 7   operative.
 8        You're going to see the service agreements that Mr. Myles
 9   signed every year or so under which the FBI has paid him
10   $1.3 million over the time he's been working with them since
11   2007.
12        Now, that pay is separate from the expensive hotels that
13   he's put up in.  You'll hear about the tens of thousands of
14   dollars that went into those when he was here in the Bay Area.
15   The top of the line cars that are provided to him.  The meals
16   and even the dry cleaning that's paid for in order to maintain
17   his image as a wealthy and successful businessman.
18        Now, by the terms of those agreements, Myles' contractual
19   services and pay can be severed at any time by the FBI if the
20   FBI decides that they are not getting their money's worth for
21   the $4,500 they pay him every two weeks, or $9,000 they pay him
22   every month.  Now, one of those agreements -- can we have
23   Exhibit 31 -- was the agreement that Agent Quinn signed with
24   Billy Myles when he was out here in the -- brought out here to
25   work with Agent Quinn on sting operations.

 1      Now, can we -- is it possible to highlight and blow up

 2   Paragraph 4, Roxanne?  Yeah.  I don't know how clear this is,

 3   but I hope you'll be able to read:

 4           "If at any time the FBI in their sole discretion

 5        determines that the value of information or assistance

 6        cited -- provided by Mr. Myles is not commensurate

 7        with $1700 [sic] a year, this agreement, the FBI shall

 8        terminate or modify the agreement."

 9      Okay?  And then it goes on to say that there are other

10   obligations -- one of them is mentioned here -- to pay taxes

11   that Myles has, and if he breaches any of those agreements, he

12   can be terminated by the FBI or they can modify or lower his

13   pay.

14      All right.  Now let's go on to the third key player on

15   May 9, and that's Taj Reid.  Now, Taj Reid had returned the

16   prior year, I think, in 2012, from Cincinnati to the Bay Area

17   where he grew up and, as you've heard, where his father,

18   Larry Reid, is a councilman in Oakland.  In early 2013 as

19   you've heard, Reid and Eric Worthen, who worked for the State

20   of California, had hoped to start a political consulting

21   business, mostly trading on his father's official position.

22   And as part of their efforts to start their business, at the

23   request of Myles, they set up a meeting on May 9th, 2013, to

24   introduce Myles to Len Turner.  Now, they had mentioned

25   Len Turner before, and he hadn't paid much attention to the

1   Turners, but it is Myles who then comes back at them and says,

2   "I want to meet with the Turners."

3        And I anticipate that Worthen will testify, as he had in

4   the past, that the meeting they set up for Myles was a straight

5   business meeting.  They were attempting, as said, to introduce

6   Myles, who they thought was, you know, a businessman who had

7   scaled every mountain a businessman could to the Turners

8   because then they would get some consulting fees.

9        But before the May 9th meeting, as you've heard, Reid and

10  Worthen had taken bribe money from Myles in exchange for

11  Worthen providing information on a state construction contract.

12  You'll hear from Worthen that he and Reid committed that

13  offense.

14       Now, Len Turner had had little contact with Reid, none

15  with Worthen before the meeting, and had no connection

16  whatsoever with the bribery offense which was completed before

17  Len ever met Myles on May 9th.  And I anticipate that the Court

18  is going to tell you, because you'll hear a lot of tapes about

19  before May 9th, about Reid or Worthen talking to Myles, that

20  none of that evidence is evidence of the Turners' guilt.  It

21  only deals with Taj Reid's state of mind and willingness to

22  enter into criminal activity with Myles.

23       So let's go on to the May 9th meeting, which is awfully

24  important.  The evidence will show that Billy Myles, acting

25  under the name William Joseph, was laying the groundwork for a

1   future sting operation against the Turner Group.  And Myles did

2   so by engaging in his stock and trade:  Lying.  I'm not being

3   argumentative.  You will hear from Myles that what he is from

4   beginning to end in his capacity as a confidential human

5   source, is a liar.  Okay?

6        Now, he goes into this meeting as William Joseph.

7   William Joseph doesn't exist.  So everything, everything that

8   Myles tells to Len Turner during this meeting with his Joseph

9   hat on is a lie.  It's all a lie.  It's all intentional

10  falsehoods.

11       But they are not random lies.  He doesn't lie about being

12  on the Jamaican bob sled team.  They are lies that are

13  carefully chosen to attempt to induce Len Turner to trust him

14  and want to do business with him in the future.

15       So first and most importantly, what is the first topic

16  that Myles brings up in the meeting with Len Turner?

17       Bonding.  Why bonding?  Because Taj Reid has told Myles,

18  told the man he believed was Joseph, that nothing is more

19  important to the Turner Group than the capacity to bond.  That

20  the capacity to bond and the limits on bonding is really what

21  keeps the business from moving to the next level.

22       So what does Myles, also known as Joseph, open up and

23  return to constantly?  Bonding.  He tells Len Turner that he

24  has $97 million of bonding available.  $97 million of bonding

25  available.  Of course it's nonsense.  He's an undercover agent

1    for -- operative for the FBI.  He has no capacity to help with

2    bonding.  But he knows like any honest and good businessman,

3    Len Turner would like to move the business to the next level.

4         Then he follows up with a bigger lie, and you're going to

5    hear this weave its way through everything that Myles does

6    thereafter.  He is going to build a big hotel in Oakland.  He

7    is going to build a 350-room hotel in Oakland.  Well, do you

8    know what a 350-room hotel would mean to the Turner Group?  You

9    know what it would mean to employment in Oakland?  It would be

10   a big deal.  It would be a very big deal.  And he returns to

11   that theme again and again in the months that he knows -- has

12   dealings with Len Turner.

13        Then he moves on to lies about how rich and successful

14   he -- Joseph is.  He has been involved in development projects

15   at Disneyland, Universal Studios, the Galleria.  According to

16   Myles, Mr. Joseph owns a significant percentage of the airport

17   businesses in Dallas and Buffalo.  All lies, one after another.

18        Then he moves on to another one of his specialties, which

19   is very important when they are going after the Turners.

20   Racial identity, solidarity, and the importance of minority

21   employment.  Oh, yes.  Mr. Myles is -- will continually tell

22   the Turners, and everybody else, because he meets a bunch of

23   other people in Oakland, that he is the man to promote minority

24   employment in Oakland.

25        Now, Mr. Joseph has no parents.  Okay?  But Myles

1    describes about how his parents died in the projects, and he

2    says that he's the first one to make it and that he's sure that

3    Len Turner is like him, a succeed story like him.  And then he

4    goes on to say that his best friend is the largest black

5    investor on the stock exchange, King Funding.  Who is King

6    Funding?  King Funding is Michael King, another -- an FBI agent

7    who actually was the one who suggested that Myles be brought

8    out and has been working with him on sting operations in this

9    area.

10        But then the closer, and you'll hear it right at the end.

11   "Certain things I want.  I'm going to" -- "Certain things I

12   want.  I'm going to include you in the deal."

13        What a promise.  What a promise.  A promise that like

14   everything else he had said was an utter lie.  Okay.  The

15   evidence will show that all of this was part of Myles and the

16   FBI attempting to groom Len Turner to include him in a sting

17   operation, the details of which had yet to be worked out.

18        Len leaves that meeting, however, quite disappointed.  He

19   really had been interested in possibly getting funding from a

20   major developer to help the Turner Group.  He was really

21   interested in Joseph making available bonding capacity.

22        However, at the end of it he says, This guy has tooted his

23   horn a lot, but I didn't hear anything concrete.  And so he

24   doesn't expect to ever hear from Mr. Joseph/Myles again.  And

25   that's the way it is for the next four months.  And then we get

1    to the first date in the indictment, when this conspiracy,

2    alleged conspiracy, is supposed to have begun.  September 9th.

3        Now, at this time Myles has Taj Reid in his proverbial

4    pocket.  He's gotten Reid to take a bribe before.  He knows

5    that Reid, who has no idea that he's dealing with an FBI

6    informant, will be on board for joining a new criminal scheme.

7        And so the sting starts to roll.  Myles, wearing his

8    Joseph cap, calls Taj Reid to describe the imaginary bidding

9    process at the FBI lab that the FBI has cooked up.  Joseph has

10   the inside track, he tells Reid on this lab project, but as

11   you've heard, he needs other bids to make his bid look good.

12       Taj Reid jumps at the opportunity to get involved in this.

13   And nobody here, certainly on the Defense side, is going to

14   defend Taj Reid.  He's into this both feet -- with both feet.

15       But Myles wants Reid to be the first one who raises this

16   project with Len Turner.  Why?  Because under the law if you

17   have two people and one of them is a Government operative, you

18   can't have a conspiracy.  So his desire is to get Taj Reid to

19   bring Len Turner on in the conspiracy.

20       But the evidence is going to demonstrate that Taj Reid,

21   along with his many other faults, is a lousy messenger.  He

22   goes and speaks to Len Turner on September 9th.  He comes back

23   to Myles on September 10th and he says, "They have accepted

24   it."

25       And Myles is, "Oh, that was fast."

1       And so they go along a little ways in the conversation.

2   Okay.  And Myles wants to know, "What did you tell him?  What

3   did you tell him?"

4       He says, "Well, I told him it was 7,000 square feet at

5   Berkeley."

6       Okay.  He says, "Do you have a roundabout number?"

7       He said -- and this is Reid speaking:  "He asked me if I

8   have to bid.  I told him no, you don't have to bid on this

9   piece.  You already have the job.  We're asking you if you want

10  to come in and be the prime.  He said" -- Taj speaking about

11  Len -- "No bidding?  I said no.  As a matter of fact, we

12  already have the plans."

13      So Taj has blown the whole thing.  What is the scheme?

14  It's to submit a phony bid.  Taj has told Len Turner he

15  wouldn't have to submit any bid.  They have got a project that

16  they want him to do the work on.  Great, terrific for the

17  Turner Group.

18      Well, this is a little frustrating for Mr. Myles, and he

19  says, No, no, no, Taj.  Let's get this right.  You've got to go

20  back to Len Turner.  It's a phony bid.  It's a phony bid.  It's

21  a phony bid.  Okay.  You've got to tell him he has to bid.

22      September 11th telephone call.  First it's with Taj Reid

23  and Myles.  And he says -- I was talking to Len, and he was

24  thinking -- now I'm quoting.  He was thinking, Well, if I have

25  to do a bid, then that means I have to go through the process

1    of having my plumbers, my electricians and this and that.

2    That's what you do with what they call a "take-off."  A real

3    bid.  That book over there (indicating).

4         And then William Joseph says, "No, no."  We ask --

5    basically I used the word, just the phony bid.

6         And what does Taj Reid say?  "You want a phony bid?"

7         William Joseph, "He ain't doing no take-off."

8         And Taj Reid says, "No, he's come back.  So you want a

9    phony bid?"

10        So the fact of the matter is that Taj Reid has described a

11   legal process to Len Turner in which they will have to do a bid

12   and has never said anything about a phony bid.  You will never

13   hear any evidence that Taj Reid himself ever said anything to

14   Len Turner about a phony bid.

15        Okay.  Now, so when Len Turner gets -- then Len Turner

16   gets on the phone, okay, with Taj Reid -- with William Myles,

17   rather.  And prior to the call after thinking that Joseph would

18   never get in touch with him, Len had been excited about the

19   notion of making a breakthrough for the Turner Group and

20   getting a project at the prestigious University of California.

21   It made sense to him that Myles might have a connection at the

22   lab that would push to the project going to a group associated

23   with Joseph.

24        You'll hear that in the construction business, everything

25   is relationships.  Okay?  But the Turner Group didn't have the

1   bonding to bid for the jobs themselves, a loan, but in a joint

2   venture with Joseph, if Joseph would provide the bonding, then

3   they would have a real shot at this project.

4       So Len's concern was getting the information needed to

5   make that bid solid and responsible so that the Turner Group

6   could service it.

7       Now, the Government has told you, and you've heard clips,

8   that says during that call Myles described the need for a

9   non-genuine bid for 6.15 million to be submitted to make his

10  bid of 57 or 59 million the lowest so that he could get the

11  project.  And although the -- the recording is less than clear,

12  he -- and you'll find that some of these are very difficult to

13  pick up -- he uses the term "phony bid" twice on that

14  conversation.  Okay.  That happened.

15      Mr. Joseph also told Len, and this is critical, that he

16  wanted the Turner Group to do all the construction.  He did not

17  want to do any construction on this project.  Okay?  He wanted

18  to develop what?  A hotel.  Back to the hotel.  And he also

19  said that he had $110 million worth of other projects in the

20  pipeline that would be available to the Turner Group and he

21  could bring them on as well.

22      And what you hear is Len asking about the details.  What

23  about scope?  What about specifications?

24      Well, scope and specifications are the specific details of

25  a project.  What do the windows look like?  What kind of doors

 1    they are going to use, so forth and so on.

 2        And -- and Myles tells Len:  There are no scope and

 3    specifications.  Don't have them.  They don't exist.  And at

 4    the end of that call, at the end of the call -- and there is no

 5    question he's described the three bids and so forth -- Len

 6    says, "I hear you.  I've got it."  He does say that.

 7        So the call ends.  And then what is the evidence that

 8    you'll hear about what Len Turner made out of this call?

 9        He was flattened by it.  It didn't make sense to him.  And

10    the reason is he was 100 percent sure that William Myles could

11    not get this contract.  Myles couldn't get it.  He didn't have

12    the qualifications.  He didn't have the licenses.  Okay?  He

13    had no licenses.  It wasn't -- you bid as a primary contractor

14    on a project.  He said that he doesn't want to have anything to

15    do with the construction.

16        But Len is thinking that he can get the project if Myles

17    will just provide him -- Mr. Joseph will just provide him with

18    the necessary bonding.  And in his mind he is going to submit

19    the proposal that Myles has asked for and he doesn't have a

20    problem with the $6.1 million that's used as the number.  And

21    the reason for that is he knows nobody gets a $6.1 million

22    contract with a proposal.  Okay?  The university will come back

23    and they will negotiate and then the critical thing is getting

24    down to the nitty ditty on the scope and the specifications.

25        But while he's really interested in this, there is an

1  aspect of it that scares him, because in the discussion Myles

2  says that both for his bid -- you know, 57, 59 -- and for

3  Len's, the rate for square foot is going to be $800.  And now

4  Len knows that when you're doing the kind of construction

5  project that he does, that is -- that is a huge number.  It's

6  probably twice as much as the footage would normally cost.

7      But if the University of California is going to accept

8  this, because according to Myles it is, then there must be a

9  reason.  And the reason has to be that this is the Berkeley

10  science lab.  This is a science lab.  It's not a school

11  building project.  Okay?  What about the doors?  What about the

12  specifications?  What about the special things that go in

13  there?  It could be that $6.1 million is too low.  He can't

14  know until he gets the scope and the specifications and

15  Mr. Myles has told him that he won't have them, he doesn't have

16  them, and he can't give them to him.

17      Okay.  Now, before I bore you to death, I'm going to tell

18  you that there is a series of two meetings, maybe one or two

19  phone calls between September 11th and October 8th, four weeks,

20  just four weeks.  And October 8th is going to be a very

21  important date.  At one point the Turners introduce Myles to a

22  number of acquaintances at a birthday party for Rebecca Kaplan,

23  who is a councilwoman in Oakland.  We have a meeting on

24  October 3rd.  And then an important set of calls on

25  October 8th.

1          Okay.  I'm just going to ask you to keep your ears open

2     for certain things, such as the qualification form, because

3     it's not only -- it's not only the bid, okay, the bid proposal

4     that Len proves the filling out on.  It's this qualification

5     form.

6          Let me have that.  I think we have that don't we Roxanne?

7     I think it will get called up here.

8          (Document displayed)

9          **MR. RIORDAN:**  All right.  During this trial you're

10    going to learn why this qualification form cements in

11    Len Turner's mind that William Joseph cannot possibly qualify

12    for this job.  The Turner Group can, but William Joseph cannot.

13    You're going to hear about an email that on September 16th Len

14    sends to Taj and says, You know, I don't know if we can get

15    this project.  "We," meaning he intends to get the project.  I

16    don't think we have the bonding.  We may not have the bonding.

17    We may lose it.

18         That's a telegram that -- an email that you send if you

19    are trying to win the project.

20         One thing is that the Government incorrectly said that

21    Len Turner said that he would submit a phony bid.  You will

22    never ever hear Len Turner use the word "phony bid."  It's used

23    a couple of times in all of these events and actually quite

24    infrequently.  You heard that it's used on the September 11th,

25    but Len Turner and, for that matter, Ms. Boersch will tell you

1    the same thing is true of Lance Turner.  They never use the

2    phony bid language.

3         And on October 3rd during a meeting that's been described

4    to you, and you're going to hear some things about this meeting

5    that show that there was a design flaw in this sting.  And it

6    was a design flaw that slapped Len Turner in the face when he

7    walked into this meeting and saw that he was going to lead --

8    listen to a call from Maria Robles.  Maria Robles wasn't

9    actually anybody at the Berkeley Lab.  She was an FBI agent

10   posing as an employee there.  And wait and -- for that, for

11   that revelation.

12        But the other thing that Len says when all of this is

13   described is, "Okay."

14        And Myles said, "Nobody is going to do a take-off".

15   Take-off" is the real bid.  But -- and he says, "No, we're

16   going to do a take-off."  He is concerned that there will be a

17   real bid with real numbers, which, of course, he needs the

18   specs and the scope.

19        October 8th, five days -- well, let me say this.  The

20   evidence will show that when Len Turner and Lance Turner left

21   that meeting, they said, "We've got to walk away from this."

22        I mean, this supposed -- this employee says that Joseph

23   can get the project, which doesn't make sense to us, but she

24   says he doesn't have the project.  She says that the Turners

25   have a good bid.

1     And Len says, "Well, if we have a good bid, why don't we

2     have the project?"

3     Oh, no, no, no.  We've got to get more information and so

4     forth.

5     The other thing that Joseph reveals at this meeting, that

6     there is never going to be a hotel in Oakland.  And needless to

7     say, that was a pretty big brass ring as far as the Turner

8     Group was concerned.

9     So on October 8th, five days later, four weeks after this

10    whole sham started, Len Turner talks to Taj Reid, who is trying

11    to shake him down for money.  He tried to get $100,000 for the

12    meeting in May 9th.  And the Government told you, yes, Len paid

13    him.  He said, "I'm not going to give you anything like that.

14    If you have five hours that you worked on it, fine."  And he

15    gives him 1200 bucks.

16    Okay.  And now Taj Reid wants $100,000 for this project.

17    And Reid calls up Myles on October 8th, and he's practically

18    crying.  He says, "Len Turner tells me that he's not going to

19    do this.  And the reason he's not going to do this is you won't

20    give him the specs and the scope."

21    Of course not.  If he's doing a real project and he

22    doesn't have the specs and scope, he is not going to go proceed

23    on it.

24    And so what does Taj Reid say?  "Well, I'll go take it to

25    somebody else."

 1         And what does Len Turner say?  "Good.  Go ahead and do

 2    that."  And then he tells Myles the same thing on the same day.

 3         And that's the end of this.

 4         Now, let me close with a very short discussion of another

 5    important issue.  Because we've talked about why the Government

 6    will not be able to prove, certainly beyond a reasonable doubt,

 7    that Len Turner had the intent to defraud the United States.

 8    But we believe at the close of the evidence, the Government

 9    is -- Judge Breyer is going to instruct you on another burden

10    that the Government bears, to prove beyond a reasonable doubt.

11    He will determine the law.

12         We believe you will hear an instruction that says that you

13    cannot convict -- and it's a rule that applies, a law, a legal

14    principle to sting operations.  You may not convict a defendant

15    based on a sting operation unless the Government can prove

16    beyond a reasonable doubt that they did not entrap the

17    defendant.

18         Well, we submit they didn't succeed in pulling him across

19    the line, but that the methods that they used absolutely

20    constitute the forbidden methods of entrapment.

21         They can disprove that in one of two ways.  They can prove

22    that somebody, the Defendant, wanted to commit a crime before

23    the Government ever met him.  That's May 9th.  May 9th.  I urge

24    you to listen carefully to see whether the Government produces

25    any evidence that before May 9th Len Turner had ever thought

1   about committing a crime in the course of his business.  And I
2   submit to you, you will not hear any.
3       There is an alternate way they can go, which is they can
4   say, okay, he wasn't predisposed, but we didn't induce him.
5   What's inducement?  Well, the instruction we believe that you
6   will get says:
7           "Evidence of inducement can consist of
8       persuasion, fraudulent representations, promises of
9       reward, and pleas based on need, sympathy, or
10      friendship."
11      You'll hear plenty of evidence that through Billy Myles
12  the Government relied just -- on just such tactics in this
13  case.  And we submit that the Government's failure to prove
14  that it did not use legal methods in this whole sting operation
15  is a separate grounds on which you're entitled to acquit.
16      Now, at the close of the evidence in this case, you may
17  think that Len Turner can be faulty for wanting the lab project
18  too much.  He was too ambitious.  He was too driven.  He was
19  too concerned with moving the Turner Group forward.  He's
20  human.  But if that's your conclusion, the evidence of his zeal
21  to get this project for the Turner Group is precisely the
22  evidence that he is innocent of the crime of falsely submitting
23  a false bid for the purpose of getting it for William Myles.
24  His zeal was genuine.  It was not intended to defraud the
25  Government.

**OPENING STATEMENT / BOERSCH**

1       And at the close of the evidence, I will rise again to ask

2   you on either of those grounds, but -- and you get to pick

3   whichever one you want to deliberate on first, either innocence

4   or entrapment.  I will ask you to render a verdict of acquittal

5   for Len Turner.

6       Thank you.

7           **THE COURT:**  Ms. Boersch.

8                       **OPENING STATEMENT**

9           **MS. BOERSCH:**  Good afternoon, ladies and gentlemen.

10      My client is Lance Turner at the table there (indicating),

11  and Lance Turner is not guilty of the crime the Government has

12  charged him with.

13      I will be brief, much briefer than either the Government

14  or Mr. Riordan because there is virtually no evidence against

15  my client, Lance Turner, as you are going to hear.

16      Lance Turner simply got caught up in the Government's

17  misguided sting operation.  He did not conspire with anyone.

18  He did not intend to defraud the United States and he did not

19  intend to defraud the United States Department of Energy, which

20  is what the Government charged him with.  The Government will

21  not be able to prove beyond a reasonable doubt that

22  Lance Turner ever intended to defraud the United States

23  Department of Energy.

24      As you heard, the Defendants, Len Turner and Lance Turner

25  and other members of the Turner family, run a family business

1    called Turner Group Construction.  They are licensed

2    contractors, and they run an honest business.  Over the years

3    Turner Group Construction has grown from being a small family

4    business into being one of the major and most well established

5    minority contractors in the East Bay in Oakland, California.

6    It is a good, solid, honest business.

7        As you just heard from Mr. Riordan, Turner Group

8    Construction submitted a proposal to do the work at the

9    Lawrence Berkeley Lab at the University of California in

10   Berkeley.  But that proposal, as Mr. Riordan explained to you,

11   was a genuine proposal.  They honestly wanted the work.  They

12   honestly believed they were going to get the job.  Len and

13   Lance Turner did not conspire to defraud the United States.

14       Why is Lance Turner here at all?  Because you're going to

15   sit through this trial.  You'll sit through hours and hours of

16   evidence, and you will barely hear Lance Turner's name

17   mentioned at all.  He simply got dragged into this Government

18   sting operation because he's Len Turner's brother, and he was

19   doing Len Turner a favor to come to two meetings with

20   William Joseph.  That's essentially it.  That's the

21   Government's evidence against Lance.

22       Lance did not participate in the vast majority of the

23   conversations or the recordings that you're going to hear, and

24   the evidence is going to show that he knew nothing about the

25   Lawrence Berkeley Lab proposal that was submitted and knew very

 1    little about the proposed work at all.

 2        Who is Lance Turner?  Lance is 58 years old.  He grew up

 3    in Oakland.  He has worked his entire life.  He started

 4    working, as you heard from Mr. Riordan, for his father,

 5    Ben Turner, who worked for an auto repair company and

 6    eventually started his own Volkswagen repair business basically

 7    in his backyard.  Ben Turner lifted that family up into what

 8    they are today, which is a very significant minority contractor

 9    in the East Bay.

10        Lance has a big family.  In addition to Len, he has two

11    other brothers and a sister.  All of them have been involved in

12    Turner Group Construction.  You will hear in this case that the

13    family is very close.  They are very close to their mother.

14    They are very close -- they were very close to their father,

15    Ben Turner, who died in July of 2013 right before the events at

16    issue in this case started.

17        After high school Lance became a carpenter's apprentice,

18    and eventually he started his own construction business.  He

19    got his contractor's license way back in the 90's, and in 2005

20    he and his brother Len and others from the family started the

21    business Turner Group Construction.  And they grew that

22    business, as I said, from a small family affair into the major

23    minority contracting business that it is today.

24        Turner Group Construction has employed hundreds of people

25    in the Oakland area since they started that business.  They

1    have put people through school.  They have employed ex-cons.

2    They have done everything they can to support their community

3    in Oakland.  That was a characteristic of the Turners that you

4    will hear in this case Mr. Myles played upon quite heavily.

5         You're also going to learn that Lance is the construction

6    guy at Turner Group.  He is not a business guy.  His role is to

7    be the boots on the ground construction guy for Turner.  He is

8    the field guy.  He works on the job sites.  He goes out,

9    manages the crew.  He makes sure that the job gets done and

10   that it gets done right.  You will hear that Lance is not the

11   business guy.  He does not prepare bids.  He does not negotiate

12   contracts.  He does not review documents.  And he does not do

13   estimating for bids.

14        So let's talk a minute about the alleged crime, because I

15   first want to adopt and agree with everything that Mr. Riordan

16   just said about this case because much of what he said applies

17   equally to Len -- to Lance as it does to Len.

18        As you heard from Mr. Riordan, this case is about a plan,

19   a supposed crime that was hatched by the FBI.  It was created,

20   it was manufactured by the FBI.  And the plan was that they

21   were going to create this fake contract to renovate a building

22   at the Lawrence Berkeley Lab at the University of California in

23   Berkeley.  And the FBI decided to execute that plan by taking a

24   paid -- highly paid Government informant that they had worked

25   with before and try to run him into the Turner Group to see if

 1    they could induce Len Turner to commit this crime that they had

 2    in their mind.

 3         That confidential paid informant, real name is

 4    William Myles.  The name he used here was Mr. Joseph.  You're

 5    going to hear a lot about Mr. Myles.  You're going to hear a

 6    lot about his background.  You're going to hear a lot from

 7    Mr. Myles himself because he's going to testify.  You're going

 8    to hear hours, I think, of recordings where Mr. Myles is

 9    speaking.  Mr. Joseph.  And much of it is incomprehensible.

10    Much of it is incomprehensible, as you'll hear, because he

11    doesn't speak in full sentences.  He has an accent.  He speaks

12    quickly.  And as you will hear when you listen to those

13    recordings, he's trying to say just enough to try to make a

14    case against somebody without actually alerting them that maybe

15    there is something wrong with what he's saying.

16         So I do urge you to listen carefully to what William Myles

17    says on these recordings.

18         William Myles told many, many lies as Mr. Riordan just

19    told you.  Many lies to Len Turner.  Many lies to Lance Turner.

20    They believed those lies.  That was a mistake on their part, no

21    doubt.  He said he was this wealthy developer.  He was coming

22    out to Oakland.  He wanted to work with minority contractors.

23    He wanted to work with black contractors.  He wanted to help

24    those minority communities to rise up.

25         Lance knew William Myles as William Joseph, so I'm going

1  to refer to him throughout any opening as William Joseph.  It's

2  going to get confusing because people are going to go back and

3  forth between William Myles and William Joseph, but I'm going

4  to talk to him as William Joseph.

5       The fact is that Lance barely knew Mr. Joseph.  He met him

6  for the very first time on September 16th.  He had only a few

7  encounters with William Joseph in the fall of 2013 and never

8  saw him again.  That was a very brief period, as you might

9  imagine, in Lance Turner's life of 58 years so far.

10      Now, the other people I want to talk briefly about is

11 Eric Worthen and Taj Reid.  Because the Government spent some

12 time talking about Taj Reid and how bad Taj Reid is and

13 Eric Worthen and how bad Eric Worthen is.  And they are going

14 to play you, I think, two hours almost of conversations between

15 Eric Worthen, Taj Reid, and William Joseph.  Why?  What does

16 that have to do with Lance?  Hardly anything at all.

17      Both of those two, as you heard, have since been convicted

18 of a crime, a crime of bribery that had nothing -- do not be

19 confused by this.  It had nothing to do with Lance Turner,

20 nothing to do with Len Turner.  Why is this evidence coming in?

21      The Government is going to tell you it's coming in to tell

22 a story.  It's coming in to tell you the story the Government

23 wants you to believe, and that story is that somehow, I

24 suppose, that because Eric Worthen and Taj Reid have done

25 something reprehensible, so too must Lance and Len Turner.  But

1   do not be -- do not be confused by that tactic.

2       Let me talk a little bit about the Lawrence Berkeley Lab

3   project and the evidence you're going to hear on that because

4   the evidence that you're going to hear about that particular

5   project is going to demonstrate to you at the end of the case

6   that Lance Turner is absolutely not guilty of the crime that

7   the Government has charged.

8       And what is the evidence that they have against Lance as

9   opposed to Len?  The evidence against Lance is going to consist

10  solely of his presence, his mere presence at two meetings,

11  where William Joseph was from and William Joseph was going on

12  and spinning his tales, and at some point talking about the

13  Lawrence Berkeley Lab project.  The first of those meetings was

14  on September 16th of 2013.  That is, in fact, the first time

15  that Lance met William Joseph.  The second meeting was on

16  October 3rd, roughly -- what is that?  Two or two and a half

17  weeks later.

18      You're going to hear those recordings, and those

19  recordings will not show any agreement at all by Lance Turner

20  to submit a fraudulent bid with the attempt to defraud the

21  Department of Energy of the United States.  That's the charge

22  against my client.

23      In fact, the evidence will show that Lance Turner had

24  virtually nothing to do with the submission of the proposal,

25  and Lance Turner knew little, if anything, about the job or any

1    of the conversations and the prior discussions that other

2    people had had, including Taj Reid.

3          As I said, the Government is going to have you listen to

4    almost two hours of conversations between Taj Reid,

5    Eric Worthen, and William Joseph.  Lance was not a party to any

6    of those conversations.  Lance did not hear any of those

7    conversations.  Lance is not even mentioned in those

8    conversations.  Nobody even heard of Lance Turner until he

9    shows up with his brother Len at the meeting on September 16th.

10   And, in fact, almost all of those conversations have nothing to

11   do with the actual charge in this case, which is supposed

12   submission of a false bid for the Lawrence Berkeley Lab project

13   to defraud the Department of Energy.

14         I want to focus on four dates that the Government focused

15   on in their opening statement because they are significant in

16   what they do not show about Lance Turner.  The first date is

17   May 9th.  That's the date, as you heard, when Len Turner first

18   meets William Joseph.  At that meeting, Lance Turner was not

19   there.  He did not participate in that meeting.  And there is

20   no mention of Lance Turner in that meeting, and you will hear

21   that recording.

22         The next date is September 9th.  That's when

23   William Joseph first tells Taj Reid about this scheme he's

24   cooked up, William Joseph, about having an inside connection.

25   And he suggests to Taj Reid that Taj Reid present that deal,

1  whatever it is, to the Turners.  During that conversation on

2  September 9th, Lance Turner is not on the phone.  Lance Turner

3  does not hear that conversation, and Lance Turner again is not

4  even mentioned.

5        Again, September 10th, the next day.  Taj Reid speaks to

6  William Joseph.  Taj Reid tells William Joseph, quote/unquote,

7  "They accepted it."

8        What is the "it"?  You'll hear that recording, and you

9  will not conclude that the "it" is what the Government says it

10  is.  And more importantly, Lance Turner was not on the phone.

11  He didn't hear that.  He's not even mentioned.  Taj Reid just

12  says "they."

13        The next date is September 11th.  That's when Len Turner

14  first meets William Joseph.  And, again, during that meeting,

15  during that phone call, Lance Turner is not there.  He's not

16  present.  He doesn't hear it.  And he's not even mentioned.

17        Lance Turner had absolutely nothing to do with the facts

18  of this case until he shows up at the meeting on

19  September 16th.  And on that day, his brother Len asked him to

20  come to the meeting to meet this guy William Joseph, who had

21  been telling Len that he was this major wealthy developer from

22  the South.  He's African-American, Mr. Joseph.  You'll see when

23  he testifies.  And he was telling them that, hey, he was coming

24  out here.  He wanted to help minority contractors.  He wanted

25  to meet minority contractors.  And he wanted to help minority

1    contractors provide jobs for their communities.

2        So Len asked Lance:  "Come with me to this meeting.  Get a

3    read on this guy for me."  So Lance shows up.

4        That meeting was at the Marriott hotel in San Francisco.

5    It lasted about three hours.  It was over cocktails and snacks.

6    The vast majority of the conversation is irrelevant chit-chat.

7    Very, very briefly, only minutes of the entire meeting is the

8    LBNL, the Lawrence Berkeley Lab job.  Only a few minutes is it

9    even mentioned.

10        Lance's participation in that meeting -- you'll hear the

11    recording -- consists of small talk.  He says nothing about the

12    Lawrence Berkeley Lab project.  It will not be clear from the

13    recordings whether he even heard anybody talk about that.  The

14    only time you'll hear Lance say anything at all of substance at

15    that meeting is when he tells William Joseph that he's been in

16    construction since 1978; it's true.  That he started as a

17    carpenter's apprentice.  That he holds a union card.  And that

18    he is the person at the Turner Group who holds the contractor's

19    license, does all the building, and doesn't get involved in the

20    estimating or the business side of things.

21        That is the Government's evidence against Lance Turner

22    from September 16th.  And I submit to you, ladies and

23    gentlemen, that that evidence will not be sufficient to prove

24    beyond a reasonable doubt that Lance joined any conspiracy and

25    certainly not a conspiracy to defraud the Department of Energy.

1    But an important point about that September 16th

2    conversation is during that conversation -- and listen to the

3    entire tape.  Nobody, nobody called the Turner Group proposal

4    phony.  That word is not used in connection with the Turner

5    Group proposal on September 16th when Lance was there.

6         Lance was simply there getting to know William Joseph,

7    having a drink, and trying to get a read on who this guy was.

8         Two days later Turner Group Construction sends off the

9    proposal that Mr. Riordan talked about, the proposal that you

10   saw.  But the evidence will show that Lance had nothing to do

11   with the preparation of that proposal.  He didn't submit the

12   proposal.  He didn't review it.  He didn't even -- even see it.

13        The only other evidence involving Lance Turner that the

14   Government will present to you consists of his presence at the

15   meeting that they described on October 3rd, 2013, after the

16   Turner Group proposal was submitted.  During that meeting, as

17   you heard, they had an FBI agent masquerading as this woman

18   called Maria Robles.  She was supposedly the insider at

19   Lawrence Berkeley National Labs, and during that meeting the

20   FBI had set up a secret video camera so they could catch all

21   this on video.

22        Now, in their opening statement, the Government said to

23   you that at that meeting Maria Robles said the Turners' phony

24   bid looked okay.  That's what the Government told you she said.

25        She never used the word "phony" to describe the Turners'

1   bid during that conversation.  It did not happen.  You can

2   listen to that recording over and over.

3        During that meeting Lance and Len asked Joseph, and/or

4   through him asked the woman on the phone whether they could get

5   specifications for the job, whether the building was occupied,

6   whether the demo was complete, whether they needed to provide

7   any equipment.  They asked those questions because they

8   believed that they submitted a genuine proposal and that they

9   had a real shot at competing for the work.  And this would be

10  of course a big deal for Turner Group Construction, to get in

11  at the University of California, which for any of you who are

12  in the Bay Area, recognize as a major presence in the East Bay.

13       The evidence will show that when Len and Lance walked out

14  of that meeting on October 3rd, though, they had decided they

15  pretty much heard enough from William Joseph.  None of it made

16  any sense to them.  And you'll hear that on the recordings.

17  You'll hear them asking questions like, This doesn't make any

18  sense to me.  It won't make any sense to you either.

19       The fall of 2013 is the last time Lance Turner had any

20  contact with William Joseph.  Brief period of time in there.

21  He never had any other conversations with William Joseph or

22  anyone else about this supposed job at Lawrence Berkeley

23  National Lab.  He heard nothing about any of this until almost

24  five years later.  Five years later.  April 2017 when suddenly

25  the Government charged Lance and his brother with the offense

OPENING STATEMENT / BOERSCH

 1   that you now have before you.

 2        I want to talk about two principles of law that are going

 3   to govern in case.  First is what you heard from Judge Breyer

 4   at the outset.  And that is that as the jurors in this case,

 5   your job is to give separate consideration to each Defendant.

 6   And why is that important?  Because in this country, we do not

 7   convict people unless there is evidence against them

 8   personally.  It's important, particularly in this case, because

 9   the Government, as you've already heard, is going to be

10   spending a lot of time discussing evidence that has absolutely

11   nothing to do with Lance Turner.  Evidence about Taj Reid,

12   about Eric Worthen, about William Joseph, about others.  But

13   you have to disregard any evidence that is not admissible

14   against Lance Turner.

15        That's really important, and I have to ask you to really

16   try to keep that in your mind as you hear this case go forward.

17   Because when some of that evidence comes in, I expect the Court

18   will give you an instruction that this particular bit of

19   evidence, whatever is coming in, is admissible only against

20   this defendant or that defendant.  Please write that down

21   because it will be very easy to forget at the end of the case

22   what evidence is admissible against what defendant.  That's

23   very hard for people to keep in their minds, but it's a very

24   important legal concept that protects individuals in the United

25   States from being wrongly convicted.

1    So when you are instructed that certain evidence is

2    admissible only against some defendants, mark that down

3    somehow.  Remember that when you go back in the jury room.

4        That rule is especially important here for two reasons,

5    one, because of the evidence that you're going to hear about

6    people that have nothing to do with Lance, Taj Reid, or

7    Eric Worthen.  By the way, Lance Turner has never met

8    Eric Worthen, ever.  Lance Turner met Taj Reid for the very

9    first time on September 16th, the same day that he met

10   William Joseph.

11       The rule about separate consideration for each defendant

12   is also really important to this case because you heard it in

13   the Government's opening statement and you'll hear it again and

14   again.  They will refer to these two Defendants as the Turners,

15   as some monolithic being.  But that's not who they are.  They

16   are two individuals, Len Turner and Lance Turner.  And you have

17   to consider them each separately.

18       When they say -- when the Government says "the Turners",

19   the Turners did this" or "the Turners did that," do not assume

20   that that means Lance Turner did anything.  They have to show

21   you what Lance Turner did, not what some monolith called "the

22   Turners" did.  So this instruction that you got at the

23   beginning of the case to give separate consideration to each

24   Defendant is critically important in this case.

25       The other thing I want to talk about briefly before I

 1   finish is these recordings because you're going to hear hours

 2   of them.  Hours of them.  The Court, I think, at the end of the

 3   case will instruct you that the recordings are the only thing

 4   that's evidence.  And many of those recordings, as I just said,

 5   are not going to be evidence against Lance Turner.

 6       When the Government plays those recordings, as they did in

 7   opening statement, the Government has prepared transcripts and

 8   the Government has written up what they say is said on those

 9   recordings.  But the Court will instruct you at the end of the

10   case that those transcripts are not the evidence.  The only

11   thing that's the evidence is the actual recordings, the actual

12   audio that you hear.  So while you may be able to read along

13   with the transcripts while you're sitting in the courtroom,

14   when you go back to deliberate, those transcripts are not

15   evidence.  Only the recordings are evidence.

16       Why is that important?  And it is critically important to

17   this case.  It's important to the case because Lance Turner and

18   Len Turner are charged with conspiring and intending to defraud

19   the Department of Energy.  So to decide this case, you have to

20   get inside their heads.  And in this case the evidence about

21   what they understood and, therefore, what they might have

22   intended is going to consist solely, almost solely of what

23   William Joseph said to them on these few occasions when they

24   met with him.  And as you listen to those recordings, you'll

25   hear William Joseph talk all his lies, but he talks very fast.

 1  He's very hard to understand.

 2      At the end of this case when you're considering the

 3  evidence, try to remember.  Lance heard what he heard on those

 4  occasions.  Lance did not have the benefit of transcripts to

 5  read along.  Lance was not able to read and reread whatever

 6  William Joseph was saying about the Lawrence Berkeley Lab job

 7  or anything else.  Lance did not have the benefit even of the

 8  recordings.  He could not play and replay them to try to figure

 9  out what William Joseph was talking about.

10      Lance Turner had only those few moments in a busy hotel

11  bar or in Joseph's hotel room when Joseph was talking at him.

12  That's what he had.  That's the evidence against Lance.

13      And, remember, you just heard the Government's opening

14  statement.  I think they mentioned Lance one time.  That was

15  it.  You heard Mr. Riordan's opening statement.  Hardly any

16  comment about Lance at all.

17      That's because there really is no evidence against

18  Lance Turner at all.  He's not guilty.  He did not conspire

19  with anyone.  He did not intend to defraud the United States.

20  He did not intend to defraud the Department of Energy.

21      So at the end of this case, I'm going to ask you to

22  consider all the evidence that you've heard, the evidence

23  admissible against Lance Turner only.  And at the end of this

24  case, I'm going to ask you to return the only verdict that's

25  going to be supported by that evidence, and that verdict is

**OPENING STATEMENT / BOERSCH**

1  that Lance Turner is not guilty of the crime that he's charged

2  with.

3      And I thank you very much for your patience, but it is a

4  really important job that you guys have.  Thank you.

5      (Further proceedings held herein, reported

6       but not transcribed.)

7            *       *       *       *       *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3

4    Monday, August 20, 2018 - Volume 1

5

                                              **PAGE**   **VOL.**
6
     Preliminary Jury Instructions                5      1
7    Opening Statement by Mr. Dawson             8      1
     Opening Statement by Mr. Riordan           21      1
8    Opening Statement by Ms. Boersch           47      1

9                          —   —   —

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

        I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.


_____

        Debra L. Pas, CSR 11916, CRR, RMR, RPR

        Thursday, June 20, 2019